RENDERED: AUGUST 22, 2024
TO BE PUBLISHED

# Supreme Court of Kentucky

2022-SC-0496-RR

JAMES T. JAMESON                                                          APPELLANT

V.                                          IN SUPREME COURT

JUDICIAL CONDUCT COMMISSION                                   APPELLEE

### OPINION OF THE COURT BY JUSTICE LAMBERT

### AFFIRMING IN PART AND REVERSING IN PART

This matter involves an appeal from a ruling of the Judicial Conduct Commission (JCC), which charged and found Judge James "Jamie" Jameson guilty of seven counts of misconduct. The JCC ordered that Judge Jameson be permanently removed from office as a circuit judge for the 42nd Judicial Circuit.

For the reasons provided herein, we hold that the JCC failed to carry its burden of proof in relation to some, but not all, of the misconduct alleged under Counts I and III and that it failed to prove all allegations of misconduct under Counts IV, V, and VI. We further hold that based on the misconduct proven under Counts I, II, III, and VII, Judge Jameson's removal from office was appropriate, but that the JCC does not have the authority to permanently remove a judge from office.

# I.FACTUAL AND PROCEDURAL BACKGROUND

For context, we will begin with an overview of some of the uncontested facts of this case. This section of the opinion does not cover all of Judge Jameson's alleged misconduct, which is discussed in greater detail in Section II(E) below.

In 2015, Judge Jameson became a circuit court judge for the 42nd Judicial Circuit which is comprised of Marshall and Calloway Counties. Soon after, he identified two ongoing problems within his judicial circuit. The first was that nearly all of his criminal docket involved cases either directly or tangentially related to substance use disorder (SUD), yet he believed defendants did not have sufficient access to SUD treatment. The second problem was overcrowding in the county jails and the accompanying cost to the counties associated with housing defendants awaiting trial.

By November 2017, Judge Jameson had begun developing a potential plan of attack to address these issues. Primarily, he intended to form a community corrections board under KRS[1] 196.700, *et seq,* and thereafter create a 501(c)(3) non-profit funding arm for the board. The non-profit arm of the board would in turn fund the construction of a 100-bed in-patient SUD treatment facility to serve the 42nd Circuit. In addition, he wanted to ensure that more criminal defendants could be placed on ankle monitors as a bond condition by utilizing a more affordable ankle monitor provider than the

---

[1] Kentucky Revised Statute.

providers being used at that time. To that end, in August 2017 Judge Jameson began discussions with Ed Brennen, a regional sales representative for Track Group, an ankle monitor manufacturing company. On December 19, 2018, Judge Jameson directed a meeting with several local officials during which he lauded both the affordability of Track Group's services as well as the superior design of the ankle monitors they produced.

On November 21, 2018, Judge Jameson sent an email to legal counsel for the Administrative Office of the Courts (AOC) seeking guidance on two pertinent issues. One, whether it would be appropriate for a CCB formed pursuant to KRS Chapter 196 to be involved in activities related to pretrial supervision, and two, whether it would be appropriate for circuit court clerks to collect the fees associated with a pretrial ankle monitoring program. Counsel for AOC responded on December 4 with a memorandum stating that its "office [had] not found any guidance in KRS Chapter 196 or elsewhere in either statutory or case law" concerning "the authority of [a] Community Corrections Board regarding the handling of funds associated with pretrial releasees and GPS monitoring" and it therefore could not "provide definitive answers." Concerning the question of whether circuit court clerks should collect fees associated with a pretrial ankle monitoring program, AOC's response was: "No, we do not recommend it." Judge Jameson never sought an opinion from the Judicial Ethics Committee about these issues.

Less than a month later, on December 31, 2018, Judge Jameson filed the Articles of Incorporation for the "42nd Judicial Circuit Community

Corrections Board" (CCB). The Articles stated that Judge Jameson was the CCB's incorporator, registered agent, and one of three board members. The other two board members were Don Cherry, Judge Jameson's father-in-law and Calloway County Fiscal Court member, and Dave Berndt, a local philanthropist that Judge Jameson met at the Kentucky Opry. The mailing address for the CCB's principal office was the Marshall County Judicial Building, the location of Judge Jameson's primary judicial chambers. The CCB received its 501(c)(3) non-profit status from the Internal Revenue Service three months later in March 2019.

Also in March 2019, Judge Jameson made voluntary appearances before the Marshall and Calloway County Fiscal Courts and advised those bodies that the then-existing process of placing criminal defendants on ankle monitors violated the law. At that time, defendants in the 42nd Circuit who were ordered to be on an ankle monitor would directly contract with a private ankle monitoring company. Neither Marshall County nor Calloway County had a contract with an ankle monitoring company. Judge Jameson advised the fiscal courts that KRS 67.372 and KRS 67.374 required that, one, in order for a judge to place an individual on an ankle monitor the county must first have a contract with an ankle monitor provider and, two, that the contract between the county and the ankle monitor provider must be selected via a public bidding process.

Acting on Judge Jameson's advice, the Calloway County Fiscal Court decided to issue a public request for proposal (RFP) seeking bids for an ankle

4

monitor service contract.[2]  The RFP was prepared by the Calloway County Attorney, Bryan Ernstberger.  On May 11, 2019, prior to the issuance of the RFP, Judge Jameson sent Ernstberger an email containing "recommendations for terms to be included in the RFP."  The email included an attached memorandum with several suggested "ankle monitor requirements."  The suggestions included in that memorandum were listed, verbatim, in the RFP that was ultimately issued by the fiscal court.  Additionally, on July 7, 2020, Judge Jameson sent Ernstberger an email that included an attachment titled "Ankle Monitor Program RFP by Ernstberger (edit 1).docx[.]"  The accompanying message from Judge Jameson said, "Attached is the final version of the RFP.  While this document does not cover every piece of equipment that will be made available to the counties, it gets the job done so we can move forward.  Please let me know if you have any questions."  Each page of the draft RFP attached to that email was virtually identical to the RFP later issued by the fiscal court.

The Calloway Fiscal Court issued the RFP on July 21, 2020.  The CCB submitted its responsive bid on July 27, which included a cover letter signed by "Jamie Jameson, Director, 42nd Community Corrections Board."  Ernstberger reviewed the three bids that were submitted in response to the

---

[2] While the RFP was issued by the Calloway County Fiscal Court, it is this Court's understanding that the company who submitted the winning bid would provide services to both Calloway and Marshall Counties pursuant to an interlocal agreement in accordance with KRS 67.372(7) ("Agreements between counties for monitoring services may, with the approval of their governing bodies, be consummated by a contract signed by all counties party thereto or by an interlocal cooperation agreement[.]").

5

RFP and recommended to the fiscal court that the CCB's bid be selected. Acting at least in part on Ernstberger's recommendation, the fiscal court selected the CCB's bid on August 19, 2020. The CCB's ankle monitoring program was implemented in the 42nd Circuit sometime in late fall of 2020.

The CCB's ankle monitoring program functioned as follows. Judge Jameson, whose court was the only court of general jurisdiction in the 42nd Circuit, would decide whether a qualifying criminal defendant should be placed on an ankle monitor as a condition of his or her bond. If so, the defendant would enter into a "Monitoring Services Agreement" with the CCB that detailed the defendant's responsibilities, including payment amounts, under the agreement. The signature block of that document provided places for the defendant and "James Jameson, Correction's Board President and Director" to sign and date.

Participants in the ankle monitor program were then monitored by the CCB's Director of GPS Services, Christine Pickett. Pickett was a third-year law student doing an unpaid externship in Judge Jameson's office when he asked her to take the position;[3] she had no prior experience in that kind of work. Pickett was a contract employee of the CCB and received compensation. She was responsible for monitoring all program participants and would receive real-

---

[3] When Pickett's externship ended on May 31, 2021, Madison Dorris took the position. Dorris had been an intern from Murray State in Judge Jameson's office during the spring 2021 semester and took the position after her internship ended. The manner in which the program ran did not change once Dorris became the Director of GPS Services.

6

time violation notifications for things like strap tampers, low battery alerts, entry of a defendant into an exclusion zone, or the departure of a defendant from an inclusion zone. Judge Jameson, 911 dispatch, two individuals from Track Group, and Dominik Mikulcik, Judge Jameson's staff attorney, also received instantaneous violation notifications.

Most of the violation alerts that occurred were resolved between Pickett and the participant, but if the issue could not be resolved or if the violation was classified as "high risk" she would issue a "notice of violation" report. A violation report provided a factual account of the alleged violation and would either state the CCB's intention of revoking the participant's monitor or request a summons or a warrant. Most violation reports did not result in the immediate issuance of an arrest warrant. But, on some occasions, Judge Jameson directed the circuit court clerk's office to issue an arrest warrant upon receipt of a violation report. The defendant would then be taken into custody and Judge Jameson would set a bond violation hearing for the next available docket date. Judge Jameson never issued an arrest warrant based solely on a participant's failure to pay his or her ankle monitoring fees.

Against the recommendation of AOC's legal counsel, the Marshall and Calloway Circuit Clerks collected the fees from defendants participating in the CCB's ankle monitor program. After collecting the fees, the clerks would write a monthly check to the CCB. Those funds were then distributed amongst various entities via checks signed by Judge Jameson. The clerks' offices did not receive a fee for providing these services.

7

In addition to the funds raised by the ankle monitoring program, which were scant, the CCB sought to raise funds by applying for grant money and fundraising. On March 17, 2021, Judge Jameson submitted a grant application with the Kentucky State Corrections Commission[4] on behalf of the CCB seeking $25,000.00 to increase the hourly pay of the CCB's Director of GPS Services. The grant application explained that paying the Director of GPS Services with the requested grant money, as opposed to funds from the ankle monitoring program, would allow more funds from the program to be funneled towards building an SUD treatment facility. The corrections commission ultimately denied funding.

As for fundraising, Judge Jameson and the CCB partnered with The Fletcher Group, a 501(c)3 nonprofit corporation founded by former Kentucky Governor Ernie Fletcher and his wife, Glenna. The Fletcher Group's purpose is to, *inter alia*, provide assistance with building SUD treatment centers in rural areas and is funded through federal grant money. On July 15, 2020, Judge Jameson attended a meeting with The Fletcher Group wherein it agreed to assist him in his endeavor to fund the construction of an SUD treatment facility. The plan to build the facility was christened "the Re-Life project." A website for the Re-Life project where donations could be made was created, and the Fletcher Group helped organize and hold a fundraiser for the Re-Life project on May 20, 2021. Judge Jameson presented a PowerPoint during the

---

[4] *See generally* KRS 196.702; KRS 196.710.

8

"educational" half of the event regarding local SUD issues.  The fundraiser and the Re-Life program were also promoted via radio ad and emails which we address in greater detail below.

This brings us to the JCC proceedings now before us.  On June 21, 2021, a disgruntled participant in the CCB's ankle monitoring program filed a judicial complaint against Judge Jameson.[5]  On October 15, 2021, the JCC held an informal hearing with Judge Jameson pursuant to Supreme Court Rule (SCR) 4.170(2).  Judge Jameson prepared a written statement for that informal hearing that addressed the judicial complaint and discussed, generally, his involvement with the CCB and the GPS program.  A week after the informal hearing a second JCC complaint was filed by a different participant in the ankle monitoring program.[6]  After several months of further investigation, the JCC issued a notice of formal proceedings and charges and an amended notice of proceedings and charges on June 13, 2022, and July 21, 2022, respectively.  Both the notice and the amended notice alleged the same four counts of misconduct related to the CCB, the Re-Life project, the ankle

---

[5] The complaint itself, filed by Amber Fralix, was not included in the record before us.  However, it appears that on June 9, 2021, the Director of GPS Services issued a violation report for Fralix based on her "failure to properly communicate with the CCB."  That violation report was then sent to Judge Jameson via email who then emailed the Marshall County Circuit Clerk's Office and requested that an arrest warrant be issued for Fralix.

[6] The second complaint, filed by Tina Mull, was not included in the record.  Unlike Fralix, Mull's violation report is also not in the record.  On October 8, 2021, Judge Jameson emailed the Marshall County Circuit Clerk's Office requesting that an arrest warrant be issued for Mull based on "a GPS violation."

9

monitoring program, Judge Jameson's courtroom conduct, acts of retaliation, and the solicitation of campaign contributions.[7]

After a temporary removal hearing the following month, the JCC voted 3-2 to temporarily remove Judge Jameson from office pending the outcome of a final hearing. Judge Jameson filed a writ of prohibition in this Court against the enforcement of the JCC's temporary suspension order. This Court ruled that the temporary suspension order was *void ab initio* due to the JCC's failure to comply with SCR 4.120, which mandates that "the affirmative vote of at least 4 members shall be required for the suspension. . .of a judge for good cause." *See Jameson v. Jud. Conduct Comm'n*, 2022-SC-0454-OA (Ky. Oct. 31, 2022). However, this Court did not rule on Judge Jameson's writ of prohibition until after his final hearing before the JCC.

In the interim, following Judge Jameson's temporary removal but prior to the final hearing, the JCC issued a second amended notice of formal proceedings and charges. The second amended notice added two counts of misconduct that alleged, respectively, that Judge Jameson had attempted to dissuade his judicial staff from complying with a JCC subpoena duces tecum issued after his temporary removal and that he failed to adhere to the terms of his temporary removal by contacting his judicial staff and using judicial resources. Three days later, the JCC filed its third and final amended notice of

---

[7] The only difference between the original notice of formal proceedings and the amended notice of formal proceedings appears to be their distribution lines, as Judge Jameson obtained new counsel after the original notice was filed.

proceedings and charges. The third amended notice added one count of misconduct which alleged that Judge Jameson had coerced a public radio station manager at Murray State University (MSU) into not pursuing a story about a security video of Judge Jameson walking around the Marshall County courthouse in his underwear. The conversation between the station manager and Judge Jameson had occurred earlier in the year, but the station manager did not inform the JCC of the alleged misconduct until after he learned of its investigation into Judge Jameson.

Following a four-day final hearing the JCC found Judge Jameson guilty of seven counts of misconduct, and unanimously voted to have him permanently removed from office. Judge Jameson appealed the JCC's findings of fact, conclusions of law, and order to this Court. After review, we remanded the case to the JCC and ordered that it supplement its findings of fact. The JCC then issued a supplemental findings of fact, conclusions of law, and final order that incorporated its original findings of fact, conclusions of law, and order. The JCC's rulings and recommendations are now before us for review.

Additional facts are discussed below as necessary.

## II. ANALYSIS

### A. Standard of Review

The JCC is required to prove the substance of its charges by clear and convincing evidence. SCR 4.160. "[C]lear and convincing proof does not necessarily mean uncontradicted proof. It is sufficient if there is proof of a probative and substantial nature carrying the weight of evidence sufficient to

11

convince ordinarily prudent-minded people[.]" *Gentry v. Jud. Conduct Comm'n,* 612 S.W.3d 832, 846 (Ky. 2020). This Court must accordingly accept the JCC's findings and conclusions unless they are clearly erroneous, i.e., unreasonable. *Id.* at 840. "By rule, on any judge's appeal, we have broad power to 'affirm, modify or set aside in whole or in part the order of the Commission, or to remand the action to the Commission for further proceedings.'" *Id.* (citing SCR 4.290(5)).

**B. Judge Jameson's arguments concerning the JCC's temporary suspension hearing and temporary suspension order are moot.**

Judge Jameson has raised several arguments in relation to the JCC's temporary removal hearing and its order temporarily removing him from office. As discussed, *supra,* this Court previously held that the JCC's order temporarily removing Judge Jameson was *void ab initio* because it was not supported by the required number of votes under SCR 4.120. We accordingly hold that these arguments are moot and consequently decline to address them.

**C. Pursuant to SCR 4.020, the JCC lacked jurisdiction to pursue claims against Judge Jameson for the alleged abuse of his contempt powers, but it did not lack jurisdiction to pursue its other claims against him based solely on a lack of a finding that Judge Jameson acted in bad faith.**

Judge Jameson asserts that the JCC lacked jurisdiction to pursue any of the charges against him because there was no evidence that any of his misconduct was committed in bad faith. In support of this argument, he cites SCR 4.020(2), which states that "[a]ny erroneous decision made in good faith shall not be subject to the jurisdiction of the Commission." Judge Jameson

12

contends that in order for the JCC to have jurisdiction over alleged misconduct by a judge, that judge must have committed the misconduct in bad faith.

Recently, in *Maze v. Judicial Conduct Commission*, this Court reiterated the long-standing meaning of this rule, stating: "This section's purpose is to merely make clear that normal legal decisions made by a judge, in her judicial role as a judge, are not subject to review by the Commission; instead litigants and lawyers are required to abide by appellate processes to contest erroneous decisions." 612 S.W.3d 793, 804 (Ky. 2020). In support, the *Maze* Court relied upon *Nicholson v. Judicial Retirement & Removal Commission*, rendered over four decades prior, which first articulated the reason for the addition of subsection (2)'s[8] language to SCR 4.020:

> The purpose of this addition was to make explicit that which we recognized to be implicit in our constitution and the rule. In a state which has an elected judiciary incompetence which is not gross and persistent can be safely left to elimination at the ballot box. Error can be adequately corrected by the appellate courts. Any other approach to the problem would destroy judicial independence by causing judges to keep one eye on their reversal rate and the other on the Commission. Both judicial eyes should be trained on the just disposition of the case at hand and not on the welfare of the sitting judge.

562 S.W.2d 306, 310 (Ky. 1978). Accordingly, SCR 4.020(2) does not provide Judge Jameson with a total jurisdictional shield for extrajudicial acts of misconduct alleged in this case as he claims. However, as we discuss in Section II(E)(3)(b) below, this rule prohibited the JCC from pursuing charges against him in relation to the alleged abuse of his contempt powers.

---

[8] Then subsection (d).

13

**D. The inclusion of lay persons on the JCC is not unconstitutional.**

Judge Jameson next argues that permitting lay persons to serve on the decision-making arm of the JCC violates the due process rights protected by the Constitutions of both the United States and the Commonwealth. However, the Kentucky Constitution itself provides the requirements for the composition of the JCC, and it states:

> Subject to rules of procedure to be established by the Supreme Court, and after notice and hearing, any justice of the Supreme Court or judge of the Court of Appeals, Circuit Court or District Court may be retired for disability or suspended without pay or removed for good cause by a commission composed of one judge of
>
> the Court of Appeals, selected by that court, one circuit judge and one district judge selected by a majority vote of the circuit judges and district judges, respectively, one member of the bar appointed by its governing body, **and two persons, not members of the bench or bar, appointed by the Governor**. The commission shall be a state body whose members shall hold office for four-year terms. Its actions shall be subject to judicial review by the Supreme Court.

Ky. Const. § 121 (emphasis added). The inclusion of laypersons on the JCC accordingly does not violate the Kentucky Constitution.

Moreover, Jameson does not explain how the inclusion of laypersons on the JCC runs afoul of the U.S. Constitution by depriving him of due process.[9] "As did the [U.S.] Supreme Court in *Powell v. Alabama*, [287 U.S. 45 (1932)], we consider due process as embodying those fundamental principles of liberty

---

[9] Judge Jameson's argument also states that the inclusion of laypersons on the JCC violates the separation of powers doctrine but fails to elaborate on that contention.

14

and justice which lie at the base of our civil and political institutions." *Ditty v. Hampton*, 490 S.W.2d 772, 774 (Ky. 1972).

In *Ditty*, Kentucky's then highest Court addressed whether due process entitled a criminal defendant in a police court[10] to have his or her case presided over by a judge who was a licensed attorney. *Id.* at 774-76. It held:

> Due process, as regards the tribunal hearing a case, usually has been considered to require only that the tribunal be fair and impartial. The function of the court is not to defend the accused, or to represent him, but to decide fairly and impartially. . . [T]he judge is not one of the accused's adversaries, and is not there either to defend or to prosecute him. So the fact that the accused needs a lawyer to defend him does not mean that he needs to be tried before a lawyer judge.

> Long before *Gideon v. Wainwright*, [372 U.S. 335 (1963)], it was recognized that both in civil and in criminal cases a party who

> could and did employ counsel was entitled as a matter of due process to be heard by that counsel. Yet it never was suggested that there was a concomitant right to a lawyer judge. To the contrary, in *Morrissey v. Brewer*, [408 U.S. 471 (1972)], the Supreme Court held that in a parole-revocation proceeding, due process required only a 'neutral and detached' hearing body, members of which need not be judicial officers or lawyers.

> [. . .]

> The inescapable conclusion is that traditional concepts of fundamental fairness do not require that an accused be tried by a lawyer judge, and that the staffing of police courts by laymen judges does not offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.

*Id.* at 774-775 (internal citations and quotation marks omitted).

---

[10] *See* KRS 26.010, *et seq.*, "Police Courts" (repealed).

15

Although police courts such as the one at issue in *Ditty* no longer exist, the notions that due process usually requires only that a tribunal be "fair and impartial" and that a layperson's service as a member of a tribunal "does not offend some principle of justice so rooted in the traditions and conscious of our people as to be ranked as fundamental" remain extant. Indeed, our reliance in *Ditty* on *Morrissey v. Brewer* regarding parole revocation proceedings requiring, *inter alia*, "a 'neutral and detached' hearing body such as a traditional parole board, members of which need not be judicial officers or lawyers" remains good law. *See Jones v. Bailey*, 576 S.W.3d 128, 138 (Ky. 2019) (quoting *Morrissey*, 408 U.S. at 489). Moreover, in criminal trials where the stakes are arguably higher than in any other form of litigation, the fact-finding body is typically composed entirely of lay persons charged with applying sometimes complicated legal standards to a set of proven facts.

Based on the foregoing discussion, this Court can discern no reason why the inclusion of lay persons on JCC panels violates the principles of due process embodied in either the U.S. Constitution or the Kentucky Constitution.

**E. Sufficiency of the Evidence**

Before we address the substance of the JCC's charges against Judge Jameson we are compelled to note that, although we previously remanded this case to allow the JCC to supplement its findings of fact and conclusions of law, JCC's manner of analysis is deficient as will be noted herein. In the interest of finally having a resolution in this case, we choose to not remand it again and instead seek to provide guidance to the JCC moving forward. We urge the JCC

16

to, when applicable, engage in the application of relevant case law and statutes to support its conclusions. Moreover, the JCC should explain in greater detail how an alleged act of misconduct violated a given rule. The JCC is further encouraged to cite to specific portions of testimony to support a given fact finding rather than the entirety of an individual's testimony.

### 1) *Count I*

Under Count I, the JCC found Judge Jameson guilty of several varying acts of misconduct that can be distilled into the following: (a) Judge Jameson created the CCB for an improper purpose; (b) Judge Jameson, or persons under his direct supervision, developed procedures, local rules, and forms for the operation of the CCB's ankle monitoring program without the approval of the Chief Justice; (c) Judge Jameson improperly appeared before two legislative bodies (the Marshall and Calloway Fiscal Courts) and injected himself into public bidding process in a manner that constituted the rigging of a public bid; (d) Judge Jameson engaged in the direct solicitation of funds for the Re-Life project; and (e) Judge Jameson submitted a grant application for an improper purpose and attempted to use the prestige of his office to influence a grant process. We will address each finding in turn.

### (a) Judge Jameson created the CCB for an improper purpose.

The JCC found that Judge Jameson's purposes in creating the CCB— funding the construction of an SUD treatment center and running a pre-trial ankle monitoring program—were improper under KRS 196.700 to KRS 196.735, the statutes governing community corrections programs and

17

community corrections boards.  A discussion of what community corrections programs and community corrections boards are, as well as their corresponding statutory purposes, is therefore necessary.

The Kentucky State Corrections Commission (the commission) is a statutory entity created by KRS 196.701.  The twenty-three-member commission was created "[t]o develop and implement a statewide strategic plan for the state and community corrections programs[.]"  KRS 196.701(1).  The commissions functions are, *inter alia,* conducting statewide assessments of community corrections programs, awarding grant monies to qualifying community corrections programs, and reviewing community corrections program plans to ensure compliance with the statewide strategic plan.  *See generally* KRS 196.702.   The goals of the statewide strategic plan include ensuring that public safety is maintained while implementing a community corrections program, reducing local commitments to the department of corrections, reducing recidivism rates, and reducing probation and parole revocations.  KRS 196.702(4)(a)-(d).

A community corrections program is "a local government agency, private nonprofit, or charitable organization" within a judicial circuit which "shall perform" one or more of the following:

(a) Prepare community penalties plans;[11]

---

[11] A community penalty plan is "a plan presented in writing to the sentencing judge which provides a detailed description of and rationale for the targeted offender's proposed sentence to a community corrections program or to one (1) or more special programs, conditions of probation, community punishments, or sanctions in lieu of lengthy incarceration[.]"  KRS 196.700(4).

18

(b) Directly provide, arrange, or contract with public and private agencies for sentencing services for offenders; and

(c) Monitor the progress of offenders placed on community penalty plans or who receive sentencing services through provisions of KRS 196.700 to 196.735[.]

KRS 196.700(2)(a)-(c). The exclusive statutory purposes of the commission and community corrections programs are to:

(1) Provide the judicial system with sentences to be used in lieu of incarceration;

(2) Develop community-based sentencing alternatives to incarceration for certain individuals convicted of a felony;

(3) Monitor and enforce the payment of restitution to victims of crime and the community through financial reimbursement, community service, or both;

(4) Stimulate local involvement in community corrections programs to assure that they are specifically designed to meet the needs of the sentencing court and the community; and

(5) Reduce expenditures of state funds by increasing community-based sentencing, reducing the rate of

recidivism, and reducing revocations of probation and parole.

KRS 196.705(1)-(5). To serve these purposes, community corrections programs are "responsible for providing services for targeted offenders,"[12] i.e., "persons charged with or convicted of one (1) or more felonies who under application of

---

[12] KRS 196.715.

law are eligible for probation or suspension of sentence."[13]  The services

provided by community corrections programs to targeted offenders

shall include one (1) or more of the following:

> (a) Preparing detailed community penalty plans for presentation to the prosecution, the sentencing judge, and by the offender's attorney.
>
> (b) Providing treatment, punishment, management, supervision, rehabilitation, mentoring, employment, and other services to targeted offenders, or contracting or arranging with public or private agencies for services for targeted offenders, as described in the community corrections plan.
>
> (c) Monitoring the progress of offenders under community penalty plans.

KRS 196.715(1)(a)-(c).

Community corrections boards are created by community corrections

programs "to provide direction and assistance to the community corrections

program in the design, implementation, and evaluation of the community

corrections program plan."[14]  KRS 196.725.  A community corrections board

must be organized as a nonprofit corporation pursuant to KRS Chapter 273,

and "shall consist of not less than eight (8) members[.]"  *Id.*  The eight members

of the board "shall include, insofar as possible, judges, Commonwealth's

attorneys, defense attorneys, crime victims or survivors, community leaders,

social workers, law-enforcement officers, probation officers, and other

---

[13] KRS 196.700(8) (defining "targeted offenders").

[14] A community corrections program plan is "a written plan for the development, implementation, operation, and improvement of a community corrections program."  KRS 196.700(3).

interested persons." *Id.* The duties of a community corrections board "shall include, but are not limited to, the following: (1) Development and recommendation of an annual budget for the community corrections program; (2) Selection of new or additional board members; (3) Arranging for a private and independent annual audit; and (4) Development of procedures for contracting for services." *Id.*

In this case, we note that there was no evidence that a community corrections program existed prior to the creation of the "42nd Judicial Circuit Community Corrections Board," nor was there any evidence that the 42nd Circuit's CCB was established by a community corrections program. *See* KRS 196.725. Judge Jameson alone filed the CCB's articles of incorporation as its incorporator, registered agent, and one-third of its board of directors. In addition, the articles of incorporation state that mailing address for the principal office of the CCB was the address of the Marshall County Courthouse and it was undisputed that the CCB's business was conducted from Judge Jameson's Marshall County judicial chambers. It was also undisputed that the CCB never had eight board members as required by KRS 196.725 during the span of time at issue in this case.

Throughout these proceedings Judge Jameson has continually argued that the 42nd Circuit's CCB was not a community corrections board pursuant to KRS 196.700, *et seq*, and was instead simply a nonprofit corporation that used the name "community corrections board." He therefore contends that the CCB was not required to comply with the foregoing statutes. But the record

21

demonstrates that, prior to the JCC's investigation, Judge Jameson repeatedly represented that the CCB was formed in accordance with the applicable statutes. For example, when he contacted legal counsel for AOC in November 2018 for advice concerning whether the CCB could run a pre-trial ankle monitoring program and whether circuit clerks could handle funds associated with the program, he stated that "I, along with other local leaders, have formed a community corrections board for our judicial circuit pursuant to KRS 196[.]" In addition, his cover letter for the CCB's responsive bid to the Calloway Fiscal Court's RFP said, "[o]ur organization is a statutory entity formed pursuant to KRS 196.725 whose membership, by statute, consists of judges, Commonwealth's attorney, licensed attorneys, community leaders and elected officials, law-enforcement officers, and other interested persons." This Court consequently finds no merit in his argument that he never intended his CCB to be formed under KRS 196.700, *et seq.*

Moreover, based on the plain language of the applicable statutes, the legislature intended community corrections programs to be focused on implementing *post-conviction* sentencing alternatives that have the potential to reduce long term incarceration rates and on providing services that allow qualifying individuals with a felony conviction to return to and remain in their communities. It further appears that community corrections boards are meant to serve in an advisory and administrative capacity to a given community

22

corrections program. Nothing in this Court's review of KRS 196.700 to KRS 196.735 suggests that a community corrections board should be involved in providing *pre-trial* ankle monitoring services to defendants that are ordered to be monitored as a bond condition. Concerningly, Judge Jameson himself appeared to reach the same conclusion prior to filing the CCB's articles of incorporation. In his December 2018 letter to counsel for AOC he noted that

> KRS 196 sets out what a community corrections board is and its purpose, in general. That chapter clearly directs that grant monies delved out by [the Commission] should be used consistent with the purposes set out in KRS 196.720. All of those purposes appear to be related to post-conviction incarceration relief of some form.

Yet despite this acknowledgement, he persisted with his plan forming a CCB that was in violation of KRS Chapter 196 in both the manner it was formed and in its overall purposes and goals.

We likewise find no support in the relevant statutes for Judge Jameson's belief that a proper function of a community corrections board could be funding the construction of an SUD treatment facility. As noted, by statute, the purpose of a community corrections board is "to provide direction and assistance to the community corrections program in the design, implementation, and evaluation of the community corrections program[,]" and its statutory duties include things such as recommending the program's budget, selecting new board members, arranging for annual audits, and developing procedures for contract services. KRS 196.725. As laudable as the goal may be, we simply cannot extrapolate from these advisory and

23

administrative statutory purposes that community corrections boards were ever meant to raise funds for the construction of an SUD treatment facility.

Based on the foregoing, we hold that the JCC's finding that Judge Jameson created the 42nd Circuit's CCB for an improper purpose was supported by clear and convincing evidence.

**(b) Judge Jameson, or persons under his supervision, developed procedures, local rules, and forms for the operation of the ankle monitoring program without the approval of the Chief Justice.**

The JCC next found that Judge Jameson or persons under his supervision developed procedures, local rules, and forms for the operation of the CCB ankle monitoring program without the approval of the Chief Justice. Judge Jameson acknowledged as much during questioning by the JCC panel:

> **JCC Panel:** Did you ever get a set of local rules from the chief justice approved to allow you to do this [ankle monitoring] program?
>
> **Jameson:** I've sent two different sets in since I've been judge, neither one has been responded to in any way form or fashion.
>
> **JCC Panel:** So you never got approval, and you realize in order to have a valid set of local rules they have to be approved by the Chief Justice.
>
> **Jameson:** I understand.
>
> . . .
>
> **JCC Panel:** So you realize in order to have a program like this and run something like this you have to have the approval of the court of justice which means the chief justice.
>
> **Jameson:** Mhm (affirmative).
>
> **JCC Panel:** And you never did, right? These forms you were going to use and all this other stuff were never approved by the Chief, correct?

**Jameson:** Correct.

SCR 1.040(3) directs in pertinent part that "[n]o local rules shall be of binding effect unless in writing, approved by the Chief Justice, and filed with the Supreme Court Clerk[.]" In addition to running the ankle monitoring program itself, the CCB also developed documents such as the "monitoring services agreement" and the "notice of violation" report, both non-AOC forms, that were utilized for the program. Based on the foregoing, we hold that the JCC's finding was supported by clear and convincing evidence.

### (c) Judge Jameson improperly appeared before a legislative body and unethically affected the fairness of a public bidding process, but he did not engage in "bid rigging."

The JCC next found that Judge Jameson's appearances before the Marshall and Calloway County fiscal courts in March 2019 were improper and that he later used his position as judge to rig the public bidding process for those counties' ankle monitoring contract.

Judge Jameson testified several times that upon taking office he became dissatisfied with the existing ankle monitoring provider and procedure. Criminal defendants who were ordered to participate in GPS monitoring as a bond condition contracted directly with a private company, as the counties did not have a direct contract with an ankle monitor provider. Defendants were being charged approximately twenty dollars per day for monitoring services, making it unfeasible for most people, particularly those that were indigent, to use its monitors. In addition, Judge Jameson believed there were issues with both the speed and manner in which violations of ankle monitor conditions

25

were being reported and the quality of the monitors being used, which were made of plastic.

According to the written statement Judge Jameson prepared for the JCC's informal hearing, he asked one of his law school interns "to look into the issue of provision of GPS devices: what the law was on the issue, if there was any, and then, look for an alternative solution for the provision of [those] devices." The intern's search found Track Group, and Judge Jameson met with a regional sales representative for Track Group for the first time on August 16, 2017. As a result of his discussions with that representative, he learned that Track Group could provide its services for a lower cost than the current providers and that its ankle monitor was made of "hardened steel."

In March 2019, Judge Jameson voluntarily appeared before the Calloway and Marshall County Fiscal Courts. He told the fiscal courts that he had an intern research ways to potentially lower the cost of ankle monitor services and that the intern found a company that was both a manufacturer of ankle monitors and a provider of monitoring services making its prices "extremely low." He further told them that a representative from the company was available to answer any questions the fiscal courts may have about the company's services and pricing. We note that Judge Jameson never identified Track Group by name during his presentation.

Judge Jameson also told the fiscal courts that their existing ankle monitoring process was illegal pursuant to KRS 67.372 and KRS 67.374. Specifically, he advised that the judicial system within a county is not

26

permitted to place someone on an ankle monitor unless and until the county has a contract with an ankle monitor provider and that the contract for those services must come from a public bidding process. While discussing that the existing ankle monitoring process also did not have a sliding scale of payment responsibility for indigent defendants, Judge Jameson promoted his nonprofit corporation as an entity that could run the ankle monitoring program. He said:

> So, how do you come up with a contract where a judge gets to decide whether or not somebody has to pay a fee and how much is paid and then someone on the other side can count on still covering their costs and hopefully making some money. So what I had proposed to a couple of folks was we've recently created a community corrections board which is a statutory structure. . . And one of the things that our community corrections board specifically could do is be the contracting entity between the manufacturer or provider and the defendant themselves and that would be a way to do the reduced fees for the indigent and have the higher fee for the non-indigent individuals. I don't know how else to work that and keep the lower sort of numbers we were hoping to get.

After Judge Jameson's presentation was concluded, the fiscal court voted to move forward with public bidding process to obtain an ankle monitoring contract.

The Kentucky Code of Judicial Conduct, Canon 3, commands that "[a] judge shall conduct the judge's personal and extrajudicial activities to minimize the risk of conflict with the obligations of judicial office." Rule 3.2 then directs, in its entirety, that:

> A judge shall not appear voluntarily at a public hearing before, or otherwise consult with, an executive or a legislative body or official, except:

27

(A) in connection with matters concerning the law, the legal system, or the administration of justice;

(B) in connection with matters about which the judge acquired knowledge or expertise in the course of the judge's judicial duties; or

(C) when the judge is acting pro se in a matter involving the judge's legal or economic interests, or when the judge is acting in a fiduciary capacity.

Comment [1] to Rule 3.2 explains that "[j]udges possess special expertise in matters of law, the legal system, and the administration of justice, and may properly share that expertise with governmental bodies and executive or legislative branch officials."  However, Comment [2] cautions that

> [i]n appearing before governmental bodies or consulting with government officials, judges must be mindful that they remain subject to other provisions of this Code, such as Rule 1.3, prohibiting judges from using the prestige of office to advance their own or others' interests, Rule 2.10, governing public comment on pending and impending matters, and Rule 3.1(C), prohibiting judges from engaging in extrajudicial activities that would appear to a reasonable person to undermine the judge's independence, integrity, or impartiality.

Accordingly, solely by way of example, if Judge Jameson had not been involved with the CCB and did not have a pre-existing relationship with Track Group, his appearances before the fiscal courts likely would have been permissible under Rule 3.2(A).  He, as a sitting judge with special knowledge of these issues, had concerns about the existing ankle monitoring process and believed from his review of two statutes that the counties were violating the law.  Under such circumstances, his presentation could have been considered a matter "concerning the law, the legal system, or the administration of justice[.]"  Notwithstanding, even under such assumed facts, Judge Jameson

28

should have been more cautious with his legal conclusions and made it clear to the fiscal courts that his interpretation of the relevant statutes could have been mistaken. This Court has been unable to locate any appellate court decision interpreting KRS 67.372 and KRS 67.374 to mandate a county to have an ankle monitoring contract in place before its court system may order an individual to be on an ankle monitor.[15] Judge Jameson should have therefore included the caveat that this is an unsettled area of the law rather than represent that his personal legal conclusions were correct.

Moving away from theoretical and into what actually occurred, Judge Jameson was the CCB's incorporator, was one of its three board members, and the CCB operated out of his judicial chambers. Based on his own statements to the fiscal courts, he clearly had an interest in having the CCB run the ankle monitoring program and wanted Track Group to be the ankle monitor services

---

[15] As the correctness of this legal conclusion has not been fully briefed or argued, and because such a ruling could impact other counties of the Commonwealth, it would not be appropriate for this Court to opine on it in this case. But it is important to note that the relevant statutes on this issue appear to be in conflict. KRS 67.372 and KRS 67.374 are housed under KRS Chapter 67 titled "County Government (Fiscal Courts and County Commissioners)." And the statues under Chapter 67 use permissive language around the subject of an ankle monitoring contract. *See, e.g.*, KRS 67.372 ("Any county or combination of counties **may** operate a global positioning monitoring system program. . ."); KRS 67.374(2) ("A county or combination of counties **electing** to participate in a global positioning monitoring system program shall. . .") (emphasis added). Yet the statues under KRS Chapter 431 and KRS Chapter 533 concerning ankle monitoring seem to require a county contract. *See, e.g.,* KRS 533.250(2)(a) ("[A] court ordering pretrial diversion may order the person to: Participate in a [GPS] monitoring system program through the use of a **county operated program** pursuant to KRS 67.372 and KRS 67.374. . ."); KRS 431.520(5)(a) ("During all or part of a person's period of release pursuant to this section, order the person to participate in a [GPS] monitoring system program **operated by a county** pursuant to KRS 67.370 and 67.374. . .") (emphasis added). At any rate, Judge Jameson's appearances before the fiscal courts were unethical in this case regardless of the accuracy of his legal conclusions.

provider. Consequently, going before the fiscal courts in his capacity as a circuit court judge was inappropriate as he remained prohibited under Rule 3.2, Comment [2] from "using the prestige of office to advance [his] or others' interests" and from "engaging in extrajudicial activities that would appear to a reasonable person to undermine [his] independence, integrity, or impartiality." We therefore hold that the JCC's finding that his appearances before the fiscal courts were unethical was supported by clear and convincing evidence.

Next, concerning the bidding process itself, two months after Judge Jameson's appearances before the fiscal courts, he sent an email and an attached memorandum to Ernstberger, the Calloway County Attorney who prepared the RFP, with the subject line "Information regarding RFP for ankle monitoring services." The email read:

> My office has put together the following detailed information regarding the statutory requirements to have a proper GPS ankle monitoring system in place. We have also included in the attached document recommendations for terms to be included in the RFP, or at least, any final contract. I am submitting this for your review in hopes of having an RFP forthwith in order to begin addressing our large jail populations. Please advise if you need any additional information at all.

The section labeled "How program should function" in the attached memorandum stated, in pertinent part:

> Consistent with the presentations made to both the Marshall & Calloway County fiscal courts and discussions with all effected agencies, it is believed that the following should be included in the RFP:
>
> > 1. **Ankle monitoring requirements.** That the RFP should also dictate that the provider make available ankle monitors that have all of the provisions as the Relialert XC3 manufactured by Track Group as well as the accompanying

high risk offender bracelet equivalent to the Track Group 'Securecuff'[.]

[. . .]

3. [. . .] Any contractor must also provide a victim alert system that can be operated via any smartphone by an alleged victim of criminal activity, and that system must work in conjunction with the offender's monitoring device in

such a manner to alert the alleged victim of the presence of the offender within a specified distance of the offender.  This technology should be substantially similarly (sic) to the "Empower" software provided by Track Group.

[. . .]

6. **Alcohol monitoring device.**  The contractor must also make available, at the request of the monitoring agency, a reasonable number of electronic devices similar in purpose to the "BACtrack" mobile device manufactured by Track Group.

On August 21, 2019, Judge Jameson emailed an example of a bid he received from Total Court Services, a different ankle monitor service provider, to Ed Brennen, Track Group's Regional Sales Representative.  Judge Jameson requested that Brennen "[edit] out the lines that would prevent Track Group from being able to meet the RFP and send it back to me[.]"  Brennen responded with an email and an attachment including "the specs [they] discussed[.]"  That email exchange was then forwarded by Judge Jameson to Ernstberger on September 17, 2019.

On January 13, 2020, Judge Jameson sent an email to Brennen with an attachment titled "Ankle Monitor Program RFP prepared by Ernstberger.docx."  The email read: "We FINALLY have a rough draft of an RFP directed at utilizing your products.  I have attached it for your review.  Please review closely to

31

ensure that this RFP will not disqualify track group from bidding." On July 7, 2020, Judge Jameson sent an email to Ernstberger with an attachment titled "Ankle Monitor Program RFP prepared by Ernstberger (edit 1).docx."

> Attached is the final version of the RFP. While this document does not cover every piece of equipment that will be made available to the counties, it gets the job done so we can move forward. Please let me know if you have any questions. If not, please let me know when your respective county governments will be posting the RFP and any further developments.

Every page of the RFP attached to that email was essentially identical to the RFP issued by the fiscal courts. For example, the RFP issued specified, in accordance with the memorandum Judge Jameson sent to Ernstberger in May 2019, that the provider "must make available ankle monitors that have all of the minimum capabilities as the Relialert XC3 ankle monitor manufactured by Track Group" as well as an "accompanying high risk offender bracelet similar to the Track Group 'Securecuff'" and must be able to make available upon request "a reasonable number of electronic devices similar in purpose to the 'BACtrack mobile' device manufactured by Track Group."

It was undisputed that no other potential bidders were permitted to suggest specifications regarding the language of the RFP, nor were they able to review and edit the RFP prior to its issuance. Indeed, a representative from Ensite, one of the providers that had been providing ankle monitoring services to defendants, contacted Judge Jameson on March 4, 2019, prior to either of his fiscal court appearances, and expressed Ensite's interest in continuing its ankle monitoring services for the counties and wanted to discuss "what the county might need to be included in a contract." Judge Jameson responded,

32

> I have made the fiscal courts aware of the statutory requirements with regard to having ankle monitor services that are not currently being met. It is my understanding that, in order to provide those services, the county will be having to make some changes. I will be doing a presentation tomorrow on the subject. Where it goes from there remains to be seen. Thank you for reaching out.

Later, on July 29, 2020, eight days after the RFP was issued, Buddi US, LLC, a different ankle monitor company, sent a letter to the Calloway County Judge Executive concerning the RFP. In it, Buddi questioned whether the intent of the court was to receive competitive proposals from interested vendors because the fiscal courts had "listed requirements that are specific to a device that is manufactured and available by only one Original Equipment Manufacturer." After noting some of the specifications listed in the RFP, Buddi opined:

> These are specific to one vendor in the entire industry and as it is currently written, the RFP uses words like must and shall in describing requirements that indicate alternative functionality will not be considered. This means that no one but Track Group or their value-added resellers can submit a responsive proposal.

After receiving a response to its inquiries from Ernstberger, Buddi decided it "[wouldn't] make sense for Buddi to submit a response" to the RFP.

After being the driving force behind the fiscal court's decision to issue an RFP, Judge Jameson made suggestions directly to the county attorney responsible for preparing the RFP on what ankle monitor specifications should be listed therein, specifically, that only bidders who could provide equipment manufactured solely by Track Group would be considered. Judge Jameson also got to view the draft RFP and edit it before sending it back to the county attorney as "the final version." Judge Jameson did all of this with knowledge that his corporation, the CCB, would submit a responsive bid to the RFP that

33

would utilize the Track Group monitor specifications that he suggested Ernstberger put in the RFP.

Based on the foregoing, we agree with the JCC's conclusion that Judge Jameson's unethically interfered with a public bid. However, we disagree with the JCC's conclusion that his conduct constituted "bid rigging" as that term is defined by the Kentucky Model Procurement Code. KRS 45A.325 defines bid rigging as "agreement or collusion **among bidders or prospective bidders** which restrains, tends to restrain, or is reasonably calculated to restrain competition by agreement to bid at a fixed price, or to refrain from bidding, or otherwise[.]" (Emphasis added). As explained by the U.S. Department of Justice, "In simple terms, bid rigging is fraud which involves bidding. It is an agreement among competitors as to who will be the winning bidder. Bid rigging occurs when a purchaser solicits bids to purchase goods or services. The bidders agree in advance who will submit the winning bid." *Preventing And Detecting Bid Rigging, Price Fixing, And Market Allocation In Post-Disaster Rebuilding Projects*, https://www.justice.gov/atr/preventing-and-detecting-bid-rigging-price-fixing-and-market-allocation-post-disaster-rebuilding (last accessed Aug. 2, 2024).

Here, there was no collusion amongst multiple bidders to determine the successful bid in advance. Rather, in what this Court must imagine is an extremely rare set of circumstances, a single bidder, the CCB, had exclusive insider access to the process of preparing the purchaser's RFP. The CCB, via Judge Jameson, used that insider access to ensure that its bid was tailor made

34

to meet the RFP. While this conduct certainly unethically affected the fairness of a public bidding process and created the appearance of impropriety, it did not constitute bid rigging.

**(d) Judge Jameson engaged in the direct solicitation of funds for the Re-Life project.**

The JCC found that Judge Jameson "personally coordinated funding activities through the CCB and engaged in direct solicitation of contributions to fund construction of the [SUD] treatment facility." Rule 3.7 directs, in pertinent part:

> (A) Subject to the requirements of Rules 3.1 and 3.4, a judge may participate in activities sponsored by organizations or governmental entities concerned with the law, the legal system, or the administration of justice, and those sponsored by or on behalf of educational, religious, charitable, fraternal, or civic organizations not conducted for profit, including but not limited to the following activities:
>
> > (1) assisting such an organization or entity in planning related to fund-raising, and participating in the management and investment of the organization's or entity's funds;
> >
> > (2) personally soliciting contributions for such an organization or entity, but only from members of the judge's family, or from judges over whom the judge does not exercise supervisory or appellate authority;
> >
> > [...]
> >
> > (4) appearing or speaking at, receiving an award or other recognition at, being featured on the program of, and permitting his or her title to be used in connection with an event of such an organization or entity, even if the event serves a fundraising purpose, but may not personally engage in direct solicitation of contributions[.]

The JCC findings first state that Judge Jameson "personally coordinated funding activities through the CCB." Although the JCC does not expound

further on this finding, we discern from elsewhere in its opinion that it is referring to Judge Jameson's actions in aiding the Fletcher Group with planning the fundraiser event held on May 20, 2021. Rule 3.7(A)(1) clearly states that a judge may assist a charitable, nonprofit organization "in planning related to fund-raising[.]" Consequently, to the extent the JCC found Judge Jameson committed misconduct by participating in the planning of the May 2021 Re-Life fundraising event, we disagree and will not consider that alleged misconduct when determining an appropriate sanction.

The JCC's findings go on to state that Judge Jameson engaged in the direct solicitation of contributions through the Re-Life website, a radio ad promoting the Re-Life fundraiser, and through emails. We address each in turn.

As previously noted, after the Fletcher Group became involved with Judge Jameson's goal of building an SUD treatment facility a website was created for the Re-Life project. Screenshots from the website were entered into evidence demonstrating that the website requested donations and that donations could be made on the site. Under a section titled "OUR HISTORY," the website read: "Re-Life is the dream of Marshall & Calloway County Circuit Court Judge, Jamie Jameson. Born out of a desire to address the overwhelming public health crisis in Benton, Murray, and all surrounding communities caused by substance abuse." And, under a section of the website titled "OUR TEAM," the website read:

> Judge Jameson chairs the 42nd Judicial Circuit Community
> Corrections Board, Inc., that is served by board members who

36

> make up our local criminal justice system, community service providers, and concerned citizens who have been personally impacted by SUD, or are aware of the seriousness of the problem and want to prevent SUD from changing [paragraph is cut off].

The JCC found that Judge Jameson "directed the creation of the Re-Life website for the CCB for the sole purpose of soliciting online donations." However, the JCC cites only the website itself as proof of this assertion and does not provide any citation to the video record that would support it. Judge Jameson testified that the Fletcher Group set up the website, and the JCC presented no evidence to rebut that claim. Of course, if the JCC had offered evidence demonstrating that Judge Jameson was responsible for the creation of the website or had directed that it be created, its finding of direct solicitation could be upheld. But, absent that proof, this Court cannot say that its finding was supported by clear and convincing evidence.

Next, a radio ad promoting the fundraiser began running locally on May 14, 2021. In the ad, an unknown male who was not Judge Jameson announced, in pertinent part, "On May twentieth, there's an informational forum and fundraiser for the Re-Life Project to bring a 100-bed in-patient drug treatment facility to the area. Former Governor Ernie Fletcher's Recovery Kentucky Group has teamed up with Judge Jamie Jameson and other leaders to help make this happen." The ad then played a brief pre-recorded statement from Governor Fletcher. The JCC found that "Judge Jameson was featured" in the ad. But, to be clear, only Judge Jameson's name and title were used.

Rule 3.7(A)(4) states that a judge may participate in activities sponsored by charitable nonprofit organizations, such as the Fletcher Group, and that a

judge's participation in such activities may include "permitting his or her title to be used in connection with an event of such an organization or entity, even if the event serves a fundraising purpose, but may not personally engage in direct solicitation of contributions[.]"  Accordingly, there was nothing unethical about Judge Jameson allowing his title to be used in connection with the Fletcher Group's fundraising event so long as the ad did not involve Judge Jameson's personal solicitation of contributions.  At no point during the radio ad does Judge Jameson make "a direct request. . . for financial support[.]"  SCR 4.300, Terminology (defining "personally solicit").  We therefore hold that the JCC's finding that Judge Jameson engaged in the direct solicitation of financial contributions through the radio ad was not supported by clear and convincing evidence.

The final two findings of solicitation each related to emails Judge Jameson sent in relation to the Re-Life program and fundraiser.  On May 10, 2021, before the Re-Life fundraiser was held, a program supervisor with the Department of Specialty Courts sent out a mass email to hundreds of people announcing an upcoming drug court graduation to be held on May 20.  Judge Jameson "piggybacked" off the drug court email recipient list and sent an email to that list that stated:

> I would like to add that on the same night as graduation, we are hosting an informational/fundraising event for the Re-Life Project. This is a joint venture of our local Community Corrections Board (which is also a 501(c)(3)) and the Fletcher Group, Inc., a nonprofit headed by former Governor Ernie Fletcher to bring a 100 bed long term [SUD] treatment and job skills facility to our circuit! . . . Please come and learn about just how devastating this problem is in our community and our plan to take it on!  If you would like

38

more info on this project, please go to www.re-life.us. This is the project website. It is not complete, but has more information about the project.

Rule 3.7 permits a judge to assist in the planning related to a fundraising event,[16] allows a judge's title to be used in connection with a fundraising event, and allows a judge to appear, speak, or receive an award or other recognition at a fundraising event.[17] However, nothing in Rule 3.7 allows a judge to "host" or personally promote a fundraising event. Comment [3] provides some guidance:

> Mere attendance at an event, whether or not the event serves a fund-raising purpose, does not constitute a violation of paragraph (A)(4). It is also generally permissible for a judge to serve as an usher or a food server or preparer, or to perform similar functions, at fund-raising events sponsored by educational, religious, charitable, fraternal, or civic organizations. Such activities are not solicitation and do not present an element of coercion or abuse the prestige of judicial office.

We accordingly agree with the JCC's finding of misconduct insofar as the rules of judicial ethics did not permit Judge Jameson to host a fundraising event, nor was he permitted to personally promote a fundraising event.

Last, a flyer was made to promote the Re-Life project. The full color flyer included a three- and one-half inch by two- and one-half inch headshot of Judge Jameson in his robe in the top right-hand corner. The body of the flyer stated: "With $2.7 million already pledged, we need just $3 million more to provide the recovery facilities our community needs to stop the cycle of reincarceration. Your generous donation can make a difference! –Kentucky

---

[16] Rule 3.7(A)(1).

[17] Rule 3.7(A)(4).

42nd Circuit Court Judge James Jameson[.]" Below that, the flyer said, "BE THE CHANGE. DONATE TODAY!" and provided contact information for the CCB. Below the CCB's contact information, the flyer stated that "[t]he 42nd Judicial Circuit Community Corrections Board is a 501c3 non-profit charity. Donations may be tax deductible."

Judge Jameson was confronted with the flyer during the JCC's final hearing and claimed that it was created by the Fletcher Group and that he had never seen it before that day. Counsel for the JCC later challenged Judge Jameson's claim that he had never seen the flyer by showing him an email he sent to a local attorney on May 10, 2021, that said, *inter alia*, "Attached is a one page promotional flyer that gives the general info regarding the project." The email also provided information about the "informational event/fundraiser" held for the Re-Life project on May 20. The promotional flyer was attached to the email, and the title for the attachment read "CALLOWAY AND MARSHALL COUNTY DONATION FLYER WITH JUDGE JAMESON PHOTO (March 9 V2).pdf[.]" Upon being confronted with the email Judge Jameson asserted, and continues to assert before this Court, that the email was something he "quickly forwarded" without looking at the attached flyer.

We hold that the JCC's finding that flyer constituted a personal solicitation of funds was supported by clear and convincing evidence. The flyer featured a photograph of Judge Jameson and a quote credited to him as "42nd Circuit Court Judge James Jameson" stating that an additional $3 million in funds were needed and that "[y]our generous donation can make a difference."

40

This was clearly a direct request for financial support. Judge Jameson claimed that he never looked at the promotional flyer before sending it as an email attachment, but that is beside the point. As a judge he had a duty to conduct himself in a manner that avoided impropriety or the appearance of impropriety. Canon 1, Rule 1.2. This duty included taking the time to review a document that included "JUDGE JAMESON" and "DONATION FLYER" in its title before sending it to another person. Thus, he was responsible for the content of the attachment which he forwarded to others as a direct solicitation for donations.

### (e) Judge Jameson submitted a grant application for an improper purpose.

The JCC's final findings of misconduct under Count I were that "Judge Jameson submitted a grant application to the Kentucky Department of Corrections seeking funding for an improper purpose on behalf of the CCB despite not qualifying with laws governing community corrections boards[,]" and that the use of his name on the grant application was "a blatant abuse of power in attempting to use the prestige of his office to influence a grant process operated by an executive branch agency in Kentucky."

As previously discussed, in March 2021, Judge Jameson filed a grant application with the State Corrections Commission, a division of the Department of Corrections, seeking funds to increase the hourly pay of the CCB's Director of GPS Services. Pursuant to KRS 196.710(1) the commission is vested with the authority to "award grants to community corrections programs in accordance with the policies established by KRS 196.700 to 196.735," i.e., the statutes governing community corrections programs and

41

community corrections boards as explained *supra*. "Grants shall be awarded to community corrections programs whose community corrections program plans meet the requirements set forth in KRS 196.720 and which, in the commission's judgment, promise to meet the goals set forth in KRS 196.700 to 196.735." KRS 196.710(2).

As explained in Section II(E)(1)(a) of this Opinion, Judge Jameson's CCB was created for a purpose and in a manner that did not satisfy the statutory requirements of KRS 196.700, *et seq.* And, under KRS 196.710, grant money may only be awarded by the commission to community corrections programs that meet the plan requirements of KRS 196.720 and that will serve the policies established by KRS 196.700 to KRS 196.735. We accordingly agree with the JCC that it was legally impermissible for Judge Jameson to seek funding from the commission for any reason, including the purpose of increasing the pay of the CCB's director of GPS services. Notwithstanding we disagree with the JCC that Judge Jameson's act of simply putting his title of "circuit judge" on the grant application constituted a "blatant abuse of power" and, without more evidence, we cannot agree that doing so was an attempt to use the prestige of his office to influence a grant process.

However, the JCC found that Judge Jameson violated: **Canon 1, Rule 1.1:** "A judge shall comply with the law, including the Code of Judicial Conduct"; **Canon 1, Rule 1.2:** "A judge shall act at all times in a manner that promotes public confidence in the independence, integrity, and impartiality of the judiciary, and shall avoid impropriety and the appearance of impropriety";

42

**Canon 1, Rule 1.3:** "A judge shall not abuse the prestige of judicial office to advance the personal or economic interests of the judge or others, or allow others to do so"; **Canon 2, Rule 2.1:** "The duties of judicial office, as prescribed by law, shall take precedence over all of a judge's personal and extrajudicial activities"; **Canon 2, Rule 2.4(B):** "A judge shall not permit family, social, political, financial, or other interests or relationships to influence the judge's judicial conduct or judgment"; **Canon 3, Rule 3.1(A):**"[W]hen engaging in extrajudicial activities, a judge shall not participate in activities that will interfere with the proper performance of the judge's judicial duties"; **Canon 3, Rule 3.1(C):** "[W]hen engaging in extrajudicial activities, a judge shall not participate in activities that would appear to a reasonable person to undermine the judge's independence, integrity, or impartiality"; **Canon 3, Rule 3.1(D):** "[W]hen engaging in extrajudicial activities, a judge shall not engage in conduct that would appear to a reasonable person to be coercive"; **Canon 3, Rule 3.2:** "A judge shall not appear voluntarily at a public hearing before, or otherwise consult with, an executive or a legislative body or official, except in connection with matters concerning the law, the legal system, or the administration of justice; [or] in connection with matters about which the judge acquired knowledge or expertise in the course of the judge's judicial duties"; and **Canon 3, Rule 3.7(A)(4):** "Subject to the requirements of Rules 3.1 and 3.4, a judge may participate in activities . . .sponsored by or on behalf of. . .charitable . . . organizations not conducted for profit, including but not limited to the following activities: appearing or speaking at, receiving an award or other

recognition at, being featured on the program of, and permitting his or her title to be used in connection with an event of such an organization or entity, even if the event serves a fundraising purpose, but may not personally engage in direct solicitation of contributions."

Based upon our extensive review of Count I discussed above, we agree that Judge Jameson violated the foregoing judicial canons and rules.

### 2) *Count II*

The misconduct charged under Count II solely concerned the implementation and operation of the CCB's ankle monitoring program. The JCC found that Judge Jameson was the appointing authority for Kentucky Court of Justice (KCOJ) employees that he utilized to perform duties on behalf of the CCB, including drafting documents for the CCB, overseeing the GPS monitoring program, and reporting violations of the ankle monitoring program directly to him.[18] The JCC further found that Judge Jameson received direct notifications of alleged ankle monitor violations and, on more than one occasion, issued arrest warrants for ankle monitor program participants upon receipt of a notice of violation reports from CCB employees who were not KCOJ employees. Finally, the JCC found that Judge Jameson improperly ordered defendants who appeared before him in circuit court to participate in an ankle

---

[18] The JCC cites to, but does not discuss, the testimonies of Dominik Mikulcik, Christine Pickett, Sarah Gipson, and Landon Norman, in support of this contention. But, to clarify, neither Gipson, Judge Jameson's administrative assistant, nor Norman, his staff attorney, ever testified that they performed any work for the CCB or the ankle monitoring program.

44

monitoring program run by the CCB, a corporation for which he held the titles of president and director and participated in its finances.

Dominik Mikulcik was one of Judge Jameson's staff attorneys and was a KCOJ employee. Although the CCB's articles of incorporation were filed by Judge Jameson, the document states: "This instrument was prepared by: Dominik Mikulcik, Staff Attorney to Judge James T. Jameson." Mikulcik initially asserted his Fifth Amendment right to remain silent regarding any work he performed in relation to the CCB, but he ultimately acknowledged doing legal research on ankle monitoring and community corrections programs during his employment with Judge Jameson and at Judge Jameson's direction.

Christine Pickett was never a KCOJ employee. Rather, she was initially a third-year law student doing an unpaid externship with Judge Jameson. Pickett testified that during her time as an extern, Mikulcik asked her to prepare a spreadsheet for participants in the CCB's ankle monitoring program that covered, "what payments they had made thus far, how much they owed, [and] when their next payment was going to be." Pickett said she compiled the spreadsheet over a weekend and not during her extern hours. Mikulcik reviewed the document and then showed it to Judge Jameson, who immediately offered Pickett the position of director of GPS services for the CCB.

Pickett testified that Judge Jameson was her direct supervisor in her role as director of GPS services and that she was compensated via checks, at least some of which were signed by Judge Jameson. Her duties as director included monitoring participants in the ankle monitoring program; collecting money

from the clerks paid by the participants; keeping track of how much money participants in the program had paid; directly communicating with defendants, the jails, and Track Group; and helping victims set up the Empower application[19] on their phones.

Concerning the ankle monitoring program itself, Pickett testified that after a defendant was ordered by Judge Jameson to be placed on an ankle monitor either she or Mikulcik would prepare the monitoring services agreement for the defendant and deliver it to the jailer. After the defendant was placed on an ankle monitor, Pickett was responsible for monitoring the individual and ensuring they compiled with the monitoring services agreement. In addition to Pickett, Judge Jameson, Mikulcik, two Track Group employees, and 911 dispatch received immediate notifications of violation alerts from the Track Group electronic monitoring program. Pickett would contact a defendant as soon as she received a violation alert. For less serious alerts, such as a low battery, Pickett would resolve the issue with the defendant herself. For more serious alerts, such as a defendant attempting to cut their ankle monitor off or being near the alleged victim, she would contact law enforcement and Judge Jameson, if he did not contact her first. Neither the commonwealth's attorney nor the defendant's attorney would be contacted at the time an alleged violation was occurring, but, if a violation report was issued, they were sent a copy of

---

[19] The Empower application, provided by Track Group, works in conjunction with a defendant's ankle monitor to inform an alleged victim if the defendant is near them.

the report after the situation with a defendant had been resolved. Pickett initially created a form to be used as the CCB's violation report. Judge Jameson reviewed the form and suggested changes which Pickett incorporated resulting in the form that the CCB issued when a violation occurred.

The JCC also presented evidence from three criminal cases in which Judge Jameson directed the circuit clerk's office to issue a bond violation warrant for a participant in the GPS monitoring program.

On April 13, 2021, Pickett sent Judge Jameson an email that read: "[Trever Tucker] has missed payments for his ankle monitor and has failed to communicate with the Corrections Board on numerous occasions. The Community Corrections Board is requesting a warrant." It appears that a notice of violation report was sent as an attachment to the email, but the report itself was not included in the record before us. On the same day, Judge Jameson forwarded Pickett's email and violation report to the Marshall County Circuit Clerk's Office with the message "Please issue a bond violation warrant." Two days later Judge Jameson forwarded Pickett's email and attachment again, this time to the Marshall County Circuit Clerk's Office and Chris Freeman, an individual from Marshall County 911 dispatch, with a message that said, "This is our first ankle monitor violation. Please issue a bond violation warrant. Chris, I spoke with Chief Reynolds already about this. The plan is to get him today if possible before he knows about the warrant, etc."

On June 10, 2021, Madison Dorris, Pickett's successor as the CCB's director of GPS services, emailed Judge Jameson a violation report for Amber

47

Fralix. Judge Jameson forwarded the violation report to the Marshall County Circuit Clerk's Office with a message stating "Please issue a warrant for Ms. Fralix." And, on October 8, 2021, Judge Jameson sent an email directly to the Marshall Circuit Clerk's Office that read, "We need to issue an arrest warrant for Tina Mull based on alleged bond condition violations. Specifically, a GPS violation. This is time sensitive. Please issue immediately." That email did not include a notice of violation report.

Finally, it was undisputed that as a circuit court judge, Judge Jameson had the responsibility of deciding whether a defendant should be released on bond and whether a condition of that bond should include participation in GPS monitoring. Once he made that ruling, he would require qualifying defendants to enter into an agreement to pay the CCB, of which Judge Jameson was the president, incorporator, and one third of the board, for the privilege of using the ankle monitor. The JCC also presented evidence that, despite Judge Jameson presiding over cases where he ordered defendants to pay the CCB, he signed checks on behalf on the CCB that were distributed to, for example, Pickett, the Marshall and Calloway Sheriffs Offices, the Marshall County Detention Center, Marshall County 911, the Calloway County Fiscal Court, and Track Group. Although Judge Jameson was never accused of mishandling or misusing any CCB funds, the appearance of impropriety this process created was blatant and extreme and Judge Jameson himself conceded its impropriety. Accordingly, the JCC proved his allegation by clear and convincing evidence.

48

Based on the foregoing, the JCC also presented clear and convincing evidence that Mikulcik, a KCOJ employee for whom Judge Jameson was the appointing authority, drafted the CCB's articles of incorporation, conducted legal research for the benefit of the CCB, prepared monitoring services agreements for participants in the ankle monitoring program, and received real time violation alerts for participants in the ankle monitoring program. And, while Pickett was not a KCOJ employee, she was hired by Judge Jameson to be an employee of a corporation for which he served as president. Pickett was therefore subject to Judge Jameson's direction and supervision. The JCC's evidence demonstrated that Pickett was primarily responsible for monitoring the participants in the CCB's program and that she sent notice of violation reports directly to Judge Jameson, who then issued arrest warrants for the violations.

The JCC further proved by clear and convincing evidence that Judge Jameson received direct notifications of ankle monitor violation alerts and, on at least three occasions, ordered arrest warrants to be issued upon receipt of a violation report from Pickett or Dorris, who were both employees of a corporation for which Judge Jameson served as president. We want to be clear for the benefit of other judges in the Commonwealth that, under normal circumstances, KRS 431.520(9) permits a judge to order the arrest of a defendant upon being advised that a defendant has not complied with the conditions of his or her release, and that statute does not specify from whom that information must come. *See also* RCr 4.42(1) ("If at any time following the

49

release of the defendant and before the defendant is required to appear for trial the court is advised . . . that the defendant has not complied with all conditions imposed upon his or her release, the court having jurisdiction may order the defendant's arrest[.]").  However, under the set of highly unusual circumstances presented by this case, it was not appropriate or ethical for Judge Jameson to issue arrest warrants based solely on information that came from an employee of his own corporation.

The JCC found that Judge Jameson violated the following rules of judicial conduct in relation to Count II: **Canon 1, Rule 1.1:** "A judge shall comply with the law, including the Code of Judicial Conduct"; **Canon 1, Rule 1.2:** "A judge shall act at all times in a manner that promotes public confidence in the independence, integrity, and impartiality of the judiciary, and shall avoid impropriety and the appearance of impropriety"; **Canon 1, Rule 1.3:** "A judge shall not abuse the prestige of judicial office to advance the personal or economic interests of the judge or others, or allow others to do so";  **Canon 2, Rule 2.1:** "The duties of judicial office, as prescribed by law, shall take precedence over all of a judge's personal and extrajudicial activities"; **Canon 2, Rule 2.2:** "A judge shall uphold and apply the law, and shall perform all duties of judicial office fairly and impartially"; **Canon 2, Rule 2.4(B):** "A judge shall not permit family, social, political, financial, or other interests or relationships to influence the judge's judicial conduct or judgment"; **Canon 2, Rule 2.9(C):** "A judge shall not investigate facts in a matter independently, and shall consider only the evidence presented and any facts that may properly be

50

judicially noticed"; **Canon 2, Rule 2.12(A):** "A judge shall require court staff, court officials, and others subject to the judge's direction and control to act in a manner consistent with the judge's obligations under this Code"; **Canon 3, Rule 3.7(6)(a):** "[A] judge may participate in activities sponsored by organizations or governmental entities concerned with the law, the legal system, or the administration of justice, and those sponsored by or on behalf of educational, religious, charitable, fraternal, or civic organizations not conducted for profit, including but not limited to the following activities: serving as an officer, director, trustee, or nonlegal advisor of such an organization or entity, unless it is likely that the organization or entity will be engaged in proceedings that would ordinarily come before the judge[.]"

Based on the JCC's findings of fact, which we hold were supported by clear and convincing evidence, we agree that Judge Jameson violated the foregoing rules of judicial conduct.

### 3) *Count III*

Under Count III the JCC found, broadly, that "Judge Jameson mismanaged his courtroom, engaged in acts of retaliation, and deviated from acceptable standards of judicial conduct." Count III then covers varied allegations of misconduct that can be broken down into four general allegations: (1) that Judge Jameson violated the principles of constitutional separation of powers by ordering individuals to participate the ankle monitoring program provided by the CCB; (2) that Judge Jameson abused his contempt powers and otherwise displayed behavior towards persons in his

51

courtroom that was not patient, dignified, or courteous; (3) that Judge Jameson pressured an attorney who regularly appeared before him in court to file a bar complaint against another attorney; and (4) that Judge Jameson engaged in two acts of retaliation.

### (a) Judge Jameson violated the constitutional principles of separation of powers.

The JCC first found under Count III that Judge Jameson violated the doctrine of separation of powers by ordering individuals to participate in pre-trial ankle monitoring services provided by a corporation for which he served as president and one third of the board. It is important to note that the JCC's charging documents never explicitly charged Judge Jameson with a separation of powers violation under Count III. Rather, the notice of formal proceedings and charges state that Judge Jameson "deviated from acceptable standards of judicial conduct including but not limited to. . . ." Nevertheless, based on the discussion of the evidence provided under Count II, the evidence was clear and undisputed that Judge Jameson, an elected judicial branch official, ordered defendants that appeared before him to participate in the ankle monitoring program ran by the CCB, a corporation for which Judge Jameson was the president and one third of the board. The supervision of defendants who have been conditionally released from custody is traditionally an executive branch function. We therefore hold that the JCC's finding was supported by clear and convincing evidence even though it failed to explicitly charge a separation of powers violation.

52

**(b) Under the specific facts in this case, the JCC was without jurisdiction to pursue charges against Judge Jameson for the alleged abuse of his contempt powers.**[20]

The JCC next alleges under Count III that Judge Jameson abused his contempt powers against a man named Richard Hoefle in January 2018 and against Marshall County Deputy Jailer Sean Goard in November 2020.[21] Judge Jameson held Hoefle in direct criminal contempt after he made several outbursts during a hearing on the Commonwealth's motion to void his granddaughter's pretrial diversion. Deputy Jailer Goard was held in civil contempt for his failure to honor a court order issued by Judge Jameson to accept a defendant into the jail's custody after she arrived at her sentencing hearing under the influence of methamphetamine. This Court's review of the video records concerning Hoefle and Goard does not bear out the JCC's finding that Judge Jameson conducted himself in a manner that was not patient, dignified, and courteous in his interactions with Hoefle and Goard. And, there is no evidence of record that Hoefle or Goard appealed Judge Jameson's findings of contempt to an appellate court, nor is there any evidence that

---

[20] As with the JCC's allegation that Judge Jameson violated the doctrine of separation of powers, this Court is concerned that the JCC's charging documents do not specifically allege that Judge Jameson abused his contempt powers under Count III. However, each of the video records concerning the abuse of contempt allegations were played at Judge Jameson's temporary removal hearing without objection. He therefore had actual notice of these allegations and was able to present a defense in relation to them during the final hearing.

[21] The JCC also cites the cases of Danny Dale and William McAlpin in its factual summary of this issue but does not make any findings of fact in relation to those cases. This Court therefore will not consider them.

Hoefle or Goard themselves filed a judicial complaint against Judge Jameson and neither individual testified during the JCC's proceedings.

As noted *supra*, SCR 4.020(2) states that "[a]ny erroneous decision made in good faith shall not be subject to the jurisdiction of the Commission." This Court has previously expounded "that 'erroneous decision' is a term of art which refers to *judicial* decisions made by judges in the course of their official duties." *Summe v. Jud. Ret. & Removal Comm'n*, 947 S.W.2d 42, 48 (Ky. 1997). And, that the purpose of SCR 4.020(2) is to ensure that errors made by judges in their official capacities that are not "gross and persistent" could be solved via the appellate process rather than sanctions by the JCC. *See Nicholson*, 562 S.W.2d at 310. This rule accordingly serves the limitation set out in Scope [5] of SCR 4.300, which directs that "[t]he Rules should not be interpreted to impinge upon the essential independence of judges in making judicial decisions." The judges who serve in our district and circuit courts make hundreds of rulings every week and have innumerable encounters with the individuals present in their courtrooms. In accordance with the foregoing principles, they should remain free to make potentially erroneous rulings in good faith without having "to keep one eye on their reversal rate and the other on the Commission." *Nicholson*, 562 S.W.2d at 310.

A judge's discretion to exercise his or her contempt powers in particular is "nearly unlimited,"[22] because that power goes to the heart of a judge's ability

---

[22] *Meyers v. Petrie*, 233 S.W.3d 212, 215 (Ky. App. 2007) (citing *Smith v. City of Loyall*, 702 S.W.2d 838, 839 (Ky.App.1986)).

to maintain order in his or her courtroom and to sanction willful disobedience to their orders. Indeed, the only previous instances of the JCC attempting to sanction a judge for the exercise of their contempt powers are *Gormley v. Judicial Conduct Comm'n*, 332 S.W.3d 717 (Ky. 2010) and *Hinton v. Judicial Retirement and Removal Comm'n*, 854 S.W.2d 756 (Ky. 1993), *overruled on other grounds by Gormley v. Judicial Conduct Commission*, 332 S.W.3d 717 (Ky. 2010).

In *Hinton*, Judge Hinton presided over the trial of Patrick Huron, who was accused of murder. 854 S.W.2d at 757. Virgil and Shirley Dermon, a married couple, were present at the time of the murder and Virgil's gun was the murder weapon. *Id.* The couple hired Anderson, an attorney, to represent them as witnesses in the case. *Id.* During the trial, Judge Hinton was informed that Virgil would be claiming his Fifth Amendment right not to testify, and that Shirley was refusing to testify under a claim of spousal privilege. *Id.* Judge Hinton ostensibly held Shirley in contempt based on her refusal to testify. *Id.* The following day, when Anderson discovered Shirley was being held in contempt, there was a bench conference and following a two-minute exchange about it, Judge Hinton held Anderson in contempt and sentenced him to three days in jail; he was released later that day. *Id.* at 757-58.

Anderson did not appeal Judge Hinton's ruling to hold him in contempt, but he thereafter filed a judicial complaint with the JCC. *Id.* at 758. The JCC found that Judge Hinton committed misconduct by summarily jailing Anderson

for contempt and ordered that he be publicly reprimanded. *Id.* at 757-58. This Court reversed the JCC's ruling and set it aside; it reasoned:

> It is the responsibility of the trial judge to maintain control of the courtroom and sometimes that must be done by a legitimate exercise of the contempt power.
>
> The decision by Judge Hinton not to permit Anderson to appear on behalf of the witnesses after Anderson had failed to comply with local rules of procedure by filing an entry of appearance or pretrial motion was not arbitrary. His subsequent decision to hold Anderson in contempt was the result of judicial discretion; there was no abuse of discretion. **The proper remedy for correcting an alleged abuse of discretion is by appeal**. Anderson, as a nonparty contemner, could have sought review by means of appeal but he did not do so.

*Id.* at 759 (emphasis added).

In *Gormley*, there was a scheduled hearing before Judge Gormley on a *pro se* motion by a wife to modify the no contact provision of a domestic violence order previously entered against her husband. 332 S.W.3d at 721. The parties, though represented, arrived for the hearing without counsel. *Id.* While the parties were waiting in the hallway, the bailiff informed Judge Gormley that the husband spoke to the wife and tried to get her to leave the courthouse. *Id.* Judge Gormley called the parties into the courtroom and— without informing the husband that it was a criminal contempt hearing, that he had the right to counsel, that he had the right to remain silent, and that his statements could be used against him—proceeded to hold an indirect criminal contempt hearing. *Id.* Judge Gormley called one witness to discuss the contact made in the hallway and did not allow the husband to question the witness. *Id.* Judge Gormley also questioned the husband under oath, who

56

admitted the contact in the hallway as well as contacting the wife at her home the previous night at her request. *Id.* Following the hearing, Judge Gormley held the husband in criminal contempt and sentenced him to six months imprisonment. *Id.*

The husband appealed Judge Gormley's ruling to the Court of Appeals, which reversed and remanded "for an appropriate evidentiary hearing concerning all the allegations of contempt." *Id.* The JCC later charged and found Judge Gormley guilty of several counts of misconduct, including a count related to the misuse of her contempt powers. *Id.* This Court affirmed the JCC's ruling and rejected Judge Gormley's claim that SCR 4.020(2) shielded her from being found guilty of misconduct. *Id.* at 726. The JCC first found that Judge Gormley's ruling was legally wrong, as summary proceedings are not an appropriate means to hold someone in indirect criminal contempt. *Id.* It went on to hold that she also acted in bad faith:

> Finding Judge Gormley clearly erred on the law is only the first half of the analysis. Judge Gormley, citing SCR 4.020(2), asserts that she made the decision in good faith and cannot be subject to the Commission's jurisdiction for good faith, but erroneous, decisions. To err is human. Our present Kentucky Constitution, Section 115, recognizes that a judge may err by providing most judgments are subject to at least one appeal. **A party that believes the judge erred has the right to appellate review to seek a change in the judgment—that is judicial review. If the judge erred, the judgment can be corrected**. Incompetent judges can be eliminated at the ballot box.
>
> Judicial misconduct is different. The Judicial Conduct Commission's review is not focused merely on the judge's findings, conclusions, and ultimate judgment, but on the judge's demeanor, motivation, or conduct in following (or in not following) the law.

57

> The Commission conducted its review and concluded the errors in Count I were so egregious that Judge Gormley could not claim the errors were made in good faith. We believe Judge Gormley's handling of the matter, together with the egregious rulings, displayed a bias or preconception or a predetermined view against the husband so as to impugn the impartiality and open-mindedness necessary to make correct and sound rulings in the case. In other words, we agree with the Commission's implicit finding that Judge Gormley acted in bad faith.

*Id.* at 726-27 (emphasis added). The *Gormley* Court went on to hold that "a judicial officer may be sanctioned if the judge committed at least one serious, obvious, egregious legal error that is clearly contrary to settled law." *Id.* at 728. This was the portion of the opinion that overruled *Hinton,* which the *Gormley* Court interpreted to hold that a judge must engage in a pattern of misconduct before he or she could be sanctioned by the JCC. *Id.* at 727.

The common thread running through *Hinton* and *Gormley* is that an individual who has been held in contempt, and believes that ruling to be erroneous, should first seek review of the ruling with an appellate court, not the JCC. Given Scope [5] of SCR 4.300's directive that the rules of judicial conduct "should not be interpreted to impinge upon the essential independence of judges in making judicial decisions[,]" a clear standard is necessary. We accordingly hold that, in the absence of an appellate court ruling that a judge has improperly exercised his or her powers of contempt and in the absence of an allegation that a judge has made erroneous rulings that were "gross and persistent," the JCC is precluded by SCR 4.020(2) from charging a judge with misconduct in relation to the exercise of his or her contempt powers.

In this case, neither Hoefle nor Goard appealed the very distant in time rulings made by Judge Jameson which found them to be in contempt, and there has been no appellate court ruling that he abused his discretion by exercising his contempt powers against them. The JCC was therefore without jurisdiction to charge Judge Jameson with misconduct in relation to the abuse of his contempt powers.

### (c) Judge Jameson pressured an attorney to file a bar complaint against another attorney.

Judge Jameson has consistently maintained throughout these proceedings that the judicial complaints filed against him were the result of a political conspiracy to harm his reputation and ensure he would not win his bid for re-election. Lisa DeRenard, a local solo practitioner, testified that on January 19, 2022, she was approached by a local public defender, Amy Harwood-Jackson. Both attorneys regularly practiced in Judge Jameson's court. According to DeRenard, Harwood-Jackson engaged in a "hateful rant" about Judge Jameson and told DeRenard that she and a few other people intended to file multiple judicial complaints against Judge Jameson. Harwood-Jackson further told DeRenard that they were looking for someone neutral to make a Facebook post about the number of complaints against him. DeRenard declined to do so.

On May 4, 2022, a "flustered" and "upset" Judge Jameson called DeRenard and informed her that multiple judicial complaints had been filed against him and asked her what she knew about them. DeRenard then recounted the conversation she had with Harwood-Jackson in January to him.

DeRenard testified that Judge Jameson was upset with her for not telling him about her conversation with Harwood-Jackson sooner and explained:

> I felt like he was guilt tripping me about not telling him back in January or February or March or April and he was telling me that what I needed to do was file a bar complaint against [Harwood-Jackson]. That if I couldn't file a bar complaint to at least contact the commission and let the commission know about this situation[.]

DeRenard testified she was "horrified" at Judge Jameson's request to file a bar complaint against Harwood-Jackson and that she did not want to do that, but she feared not doing anything because she still had clients with pending cases before him. DeRenard elected to contact the JCC's investigator and gave a statement.

The JCC's finding that Judge Jameson attempted to pressure DeRenard into filing a bar complaint against Harwood-Jackson was accordingly supported by clear and convincing evidence.

### (d) Judge Jameson engaged in two acts of retaliation.

The JCC last alleged under Count III that Judge Jameson engaged in two acts of retaliation. The circumstances surrounding these acts of retaliation are discussed in more detail under Count VII below which we hold was supported by clear and convincing evidence. For our purposes here, the evidence clearly demonstrated that, after a rumor began spreading concerning security footage of Judge Jameson walking around the Marshall County courthouse in his underwear, he engaged in acts of retaliation against two individuals in relation to that video.

60

The first individual was Chad Lampe, a radio station manager at MSU. After the radio station filed an open records request for access to the security footage, Judge Jameson called the president of MSU and informed him about the open records request. Judge Jameson then asked Lampe to call him and told Lampe during that call that he had already spoken with the president and that the president was not happy about the open records request. Lampe testified that he was later made to give an accounting of his conversation with Judge Jameson to his direct supervisor and MSU's provost, who answers only to the president. Lampe testified that he soon after left his employment with MSU and that, although the situation that occurred with Judge Jameson was not the sole reason he left, it "accelerated [his] departure."

The second individual was Sergeant Jeff Daniel, the head of security for the Marshall County courthouse. After the rumor about the security footage began to spread, Judge Jameson became convinced that Sergeant Daniel was the individual that informed media outlets of its existence. Judge Jameson first complained to the sheriff's department about Sergeant Daniel in an attempt to have him removed from the Marshall County courthouse. The sheriff's department treated Judge Jameson's request as an official complaint and investigated Sergeant Daniel. It found no evidence of wrongdoing and informed Judge Jameson that he could not be removed absent a finding of misconduct. When that did not work, Judge Jameson complained to the sheriff that he feared Sergeant Daniel might plant evidence in his office or "do something" in his courtroom. The sheriff testified that, based on Judge

Jameson's continued complaints, he reassigned Sergeant Daniel. Although the sheriff continued to believe Sergeant Daniel had not and would not commit such misconduct, he was forty-five days out from retirement and was a "chain of command" officer who would not fight the decision to reassign him.

Based on the foregoing, the JCC's finding that Judge Jameson engaged in two acts of retaliation was supported by clear and convincing evidence.

The JCC found that Judge Jameson violated the following rules of judicial conduct in relation to Count III: **Canon 1, Rule 1.1:** "A judge shall comply with the law, including the Code of Judicial Conduct"; **Canon 1, Rule 1.2:** "A judge shall act at all times in a manner that promotes public confidence in the independence, integrity, and impartiality of the judiciary, and shall avoid impropriety and the appearance of impropriety"; **Canon 2, Rule 2.2:** "A judge shall uphold and apply the law, and shall perform all duties of judicial office fairly and impartially"; **Canon 2, Rule 2.3(A):** "A judge shall perform the duties of judicial office, including administrative duties, without bias or prejudice"; **Canon 2, Rule 2.3(B):** "A judge shall not, in the performance of judicial duties, by words or conduct manifest bias or prejudice, or engage in harassment, including but not limited to bias, prejudice, or harassment based upon race, sex, gender, religion, national origin, ethnicity, disability, age, sexual orientation, marital status, socioeconomic status, or political affiliation, and shall not permit court staff, court officials, or others subject to the judge's direction and control to do so"; **Canon 2, Rule 2.4(B):** "A judge shall not permit family, social, political, financial, or other interests or relationships to influence

the judge's judicial conduct or judgment"; **Canon 2, Rule 2.8(B):** "A judge shall be patient, dignified, and courteous to litigants, jurors, witnesses, lawyers, court staff, court officials, and others with whom the judge deals in an official capacity, and shall require similar conduct of lawyers, court staff, court officials, and others subject to the judge's direction and control."[23]

We agree with the JCC's findings that Judge Jameson violated the foregoing canons and rules under Count III, save for two. First, there was no evidence that Judge Jameson violated Canon 2, Rule 2.3(A). Comment [2] to Rule 2.3 provides that:

> Examples of manifestations of bias or prejudice include but are not limited to epithets; slurs; demeaning nicknames; negative stereotyping; attempted humor based upon stereotypes; threatening, intimidating, or hostile acts; suggestions of connections between race, ethnicity, or nationality and crime; and irrelevant references to personal characteristics. Even facial expressions and body language can convey to parties and lawyers in the proceeding, jurors, the media, and others an appearance of bias or prejudice. A judge must avoid conduct that may reasonably be perceived as prejudiced or biased.

The JCC presented no evidence that Judge Jameson displayed such bias or prejudice in the performance of his judicial duties. In that vein, Canon 2, Rule 2.3(B) also forbids a judge to display bias or prejudice in the performance of their judicial duties and further forbids them to engage in harassment. Comment [3] to Rule 2.3 defines harassment as "verbal or physical conduct that denigrates or shows hostility or aversion toward a person on bases such

---

[23] To clarify, while Judge Jameson did not violate this rule in relation to Hoefle or Goard, it was undignified of him to ask DeRenard to file a bar complaint against Harwood-Jackson. His actions concerning Sergeant Daniel were likewise undignified.

as race, sex, gender, religion, national origin, ethnicity, disability, age, sexual orientation, marital status, socioeconomic status, or political affiliation." Again, the JCC presented no evidence that Judge Jameson engaged in such conduct.

### 4) *Count IV*

Under Count IV, the JCC found by a vote of 5-0 that "Judge Jameson used his influence and the prestige of his judicial office to pressure persons to donate to or support his political campaign," and that this finding was supported by the testimonies of Lisa DeRenard and Landon Norman. The JCC found that Judge Jameson improperly solicited campaign donations from DeRenard during a December 15, 2021, phone call and thereafter contacted her on "several other occasions in March of 2022" requesting her attendance at campaign events and seeking additional financial support. The JCC noted that DeRenard felt pressured to donate because she had pending felony criminal cases in Judge Jameson's court. The entirety of the JCC's findings concerning Norman were that "Landon Norman testified that during his initial interview for the position of staff attorney for the 42nd Judicial Circuit, the subject of Judge Jameson's campaign was raised. Mr. Norman testified that, in response to the subject, he indicated he would be glad to assist with Judge Jameson's campaign."

Based on the foregoing, the JCC found that Judge Jameson violated Canon1, Rule 1.1;[24] Canon 1, Rule 1.2;[25] Canon 1, Rule 1.3;[26] and Canon 4, Rule 4.1(A)(8).[27] After thorough review, we hold that the factual record is insufficient to uphold the JCC's findings of misconduct under Count IV and dismiss it in its entirety.

We begin with Judge Jameson's alleged misconduct of asking Lisa DeRenard to support his campaign. DeRenard testified that Judge Jameson called her on her personal cellphone on December 15, 2021. He first asked after her wellbeing, as a devastating tornado had recently hit the area. He then informed her that someone had filed to run against him in the upcoming election. DeRenard testified about the conversation as follows:

> I asked who [was running against him], and he told me the name of the person and said that he needed support, and he was asking me for my support. . . He did describe to me what his goals were in the future for continuing treatment for people who are criminally accused, you know, basically telling me what he's running on for his campaign. But I got from the conversation that he was very hurt that someone was running against him, that he really loves his job, and that he needed support. And I said, "Well you say support, what do you mean by that? Are you asking for money?" And he kind of laughed and said, "Well, yeah, that would help."

---

[24] "A judge shall comply with the law, including the Code of Judicial Conduct."

[25] "A judge shall act at all times in a manner that promotes public confidence in the independence, integrity, and impartiality of the judiciary, and shall avoid impropriety and the appearance of impropriety."

[26] "A judge shall not abuse the prestige of judicial office to advance the personal or economic interests of the judge or others, or allow others to do so."

[27] "Except as permitted by law, or by Rules 4.2, 4.3, and 4.4, a judge or a judicial candidate shall not . . . personally solicit or accept financial or in-kind campaign contributions other than through a campaign committee authorized by Rule 4.4[.]" We note that the JCC's supplemental order lists this as a violation of "Canon 4, Rule 4.8," which does not exist. Based on context and the language in the order, we discern that the JCC intended to list Rule 4.1(A)(8).

65

Later, on cross-examination concerning the December 2021 phone call, DeRenard testified as follows:

> **Counsel:** The person that brought up whether money was involved was you.
>
> **DeRenard**: Yes.
>
> **Counsel:** [Judge Jameson] did not say, "Hey Lisa I need you to give me money."
>
> **DeRenard:** No, he did not use that term he said support.

DeRenard agreed with Jameson's counsel that "support" could mean many things apart from a financial contribution.

During the December 2021 conversation, DeRenard told Judge Jameson that she could only afford to donate $250 at that time but if she could afford to donate additional money later, she would. Judge Jameson requested that she send the money to his campaign committee and gave her the contact information to do so. DeRenard testified that she interpreted his request to mean a financial contribution and felt as though she could not decline his request because she had clients with pending felony criminal cases in his court. She further stated that she would not have otherwise donated to his campaign, nor anyone else's campaign, at that time because she had been financially affected by the tornado, it was ten days before Christmas, and her young grandchild had recently contracted COVID.

Despite the JCC finding that Judge Jameson called DeRenard "several" times in March 2022, DeRenard only testified about two phone calls that occurred that month. DeRenard testified that the first phone call, on March 4,

66

concerned yard signs and an upcoming campaign event at Pagliai's Pizza in Murray. DeRenard testified that Judge Jameson asked her if she wanted a yard sign during the March 4 phone call. She said she told him that it would be futile to put a yard sign in the yard of her home because she lived on a dead-end street but offered to put one in her office window where it would be seen by more people. DeRenard testified she was unable to go to the event at Pagliai's, so she donated an additional $250 through Judge Jameson's campaign website.

DeRenard then testified that later in March, on an unspecified date, Judge Jameson called her again and requested her attendance at a different campaign event at Marcella's Kitchen in Benton. She also claimed that during this call Judge Jameson asked her to ask her office building's landlord if he could place a larger sign at an intersection on the building's property. She claimed that on the same day he requested this, she spoke with her landlord who approved of the sign being placed.

Finally, DeRenard testified about an email she received from Judge Jameson's campaign committee promoting the Marcella's Kitchen event. The flyer stated that $250 was a minimum contribution and $900 was an average contribution. Based on that flyer she donated an additional $400 so that she would be considered an "average" donor. She also attended the Marcella's Kitchen event and gave an impromptu speech in support of Judge Jameson at the event.

The primarily applicable judicial rule to address this alleged misconduct is SCR 4.1(A)(8) which states that "(A) Except as permitted by law, or by Rules 4.2, 4.3, and 4.4, a judge or a judicial candidate shall not . . . personally solicit or accept financial or in-kind campaign contributions other than through a campaign committee authorized by Rule 4.4[.]" The "terminology" section of SCR 4.300 defines "personally solicit" as "a direct request made by a judge or a judicial candidate for financial support or in-kind services, whether made by letter, telephone, social media, or any other means of communication."

Preliminarily, we note that there was evidence of record that contradicted DeRenard's version of events. Included in the evidentiary record is a screenshot of three text messages DeRenard sent Judge Jameson on March 3, the day before she claimed the first call in March 2022 occurred. The first text message from DeRenard in that exchange said she had asked her landlord that day if Judge Jameson could place a sign on the building's property and that her landlord approved. The second text message provided her "personal email contact where [she] would want to receive info on events[.]" And the third said, "I am requesting a yard sign to put in my window please let me know if I would need to pick it up and if so where. Thanks. Lisa DeRenard." In addition, on March 6, DeRenard and Judge Jameson's wife exchanged several Facebook messages. In one of those messages DeRenard said, "[H]ope you got my message that [my landlord]. . . approves of Jamie putting his signs there and I need a yard sign for my office window."

More importantly, based on DeRenard's own testimony, Judge Jameson did not make a direct request for a financial campaign contribution. Rather, he asked for her "support," and she brought up the subject of a monetary contribution. The question, then, is whether it was ethical for Judge Jameson to not reject her suggestion that she make a financial contribution to his campaign and thereafter direct her to send the funds to his campaign committee. We hold that it was.

While there is no published case law addressing this specific set of circumstances, we note that the facts of this case are not like those of *Alred v. Commonwealth, Judicial Conduct Comm'n*, 395 S.W.3d 417 (Ky. 2012) or *Gentry, supra*, both of which affirmed a JCC finding that a judge had personally solicited money.

In *Alred*, Judge Alred had filed a complaint against Kentucky Utilities (KU) with the Public Service Commission. 395 S.W.3d at 444. He later decided to dismiss the complaint and contacted counsel for KU on the phone to inform him or her of his intention. *Id.* During that phone call "he urged counsel for KU to agree to donate $12,500 for playground equipment at the elementary school that [his] children attended." *Id.* This Court affirmed the JCC's finding that "Judge Alred personally solicitated (sic) the donation from counsel for KU." *Id.* In *Gentry*, this Court upheld the JCC's finding that Judge Gentry, a family court judge, coerced members of her GAL[28] panel to donate the maximum

---

[28] Guardian ad litem.

amount to her campaign. 612 S.W.3d at 836. As Judge Gentry stipulated to this misconduct, the factual details are omitted from the *Gentry* Opinion. But the JCC found that based on Judge Gentry's testimony and the totality of the evidence "she had clear expectations of the level of participation by her panel members as to . . . money contributed . . . and insufficient participation led to retaliation." *Id.*

Moreover, in *Williams-Yulee v. Florida Bar*, 575 U.S. 433 (2015), the United States Supreme Court addressed a First Amendment challenge to Florida Canon of Judicial Conduct 7C(1), which is substantially similar to SCR 4.1(A)(8).[29] The Court concluded that the canon served a compelling state interest in preserving the integrity of the judiciary and was not overly restrictive because it

> restricts a narrow slice of speech . . . Canon 7C(1) leaves judicial candidates free to . . . write letters, give speeches, and put up billboards. They can contact potential supporters in person, on the phone, or online. They can promote their campaigns on radio, television, or other media. They cannot say, "Please give me money." They can, however, direct their campaign committees to do so.

*Id.* at 452. Indeed, Comment [5] to SCR 4.1 directs that "[t]hese Rules do not prohibit candidates from campaigning on their own behalf."

Accordingly, there was nothing unethical about Judge Jameson contacting DeRenard and asking for her "support." Further, there is nothing in

---

[29] The Florida Canon states that candidates for judicial office "'shall not personally solicit campaign funds . . . but may establish committees of responsible persons' to raise money for election campaigns." 575 U.S. at 433.

70

the rules of judicial ethics that required him to reject DeRenard's offer of a monetary donation in response to his request for support. Apart from requesting a monetary donation, the rules only prohibited him from personally accepting a financial donation, which he did not do. Rather, it was undisputed that he directed DeRenard to send her donation to his campaign committee. While we understand and acknowledge DeRenard's testimony that she felt pressured to make a monetary donation, it would be inappropriate to conclude that Judge Jameson committed misconduct based solely on DeRenard's subjective belief that he meant a financial contribution when her own testimony was that he only requested her "support."[30]

Next, concerning Landon Norman, one of Judge Jameson's staff attorneys, we reiterate that the JCC found Judge Jameson to have violated, *inter alia*, SCR 4.1(A)(8), which prohibits the personal solicitation of campaign contributions, and note that the "terminology" section of SCR 4.300 defines "contribution" as "both financial and in-kind contributions, such as . . . volunteer services . . . which, if obtained by the recipient otherwise, would require a financial expenditure." Therefore, Judge Jameson's alleged misconduct, if proven, could have fallen under this rule. But an equally if not more applicable rule, which the JCC did not address, is Rule 4.1(A)(10), which

---

[30] Although it was not directly addressed by the JCC, we further note for clarity that there was nothing unethical about the flyer for the Marcella's Kitchen campaign event providing recommended contributions, as that flyer states that the event was "organized and carried out by the Committee to Re-Elect Judge Jamie Jameson" and was emailed to DeRenard by Judge Jameson's wife.

states: "Except as permitted by law, or by Rules 4.2, 4.3, and 4.4, a judge or a judicial candidate shall not . . . use court staff, facilities, or other court resources in a campaign for judicial office[.]" Comment [11] to Rule 4.1 explains that "Paragraph A(10) does not prohibit court staff from using their own time, while not being paid as court staff, to assist in a campaign for judicial office consistent with Part III of the Administrative Procedures of the Kentucky Court of Justice, Personnel Policies."

In a May 24, 2024, letter from Norman to the JCC he explained the context of the conversation with Judge Jameson and his personal desire to work on his judicial campaign. In it, he wrote:

> During my initial interview for [the position of staff attorney], held on May 5, 2021, Judge Jameson and I discussed in depth the campaign and the election process. The Conversation arose from my degree from Georgetown College. I expressed that I had a great interest in politics and elections. . . At the time of the interview, Judge Jameson did not have a challenger in the upcoming election. However, we discussed the potential scenario where he did, in fact, have an opponent. The possibility of gaining insight into how to successfully operate a campaign was invaluable to me with regard to any personal future political aspirations. It was at this time that Judge Jameson indicated that, if desired, I could participate on his campaign committee. Judge Jameson specified that this would be on a volunteer basis and would be separate from the duties as Staff Attorney for the 42nd Judicial Circuit. I jumped at the opportunity without hesitation. . . I do not recall a single incident in which I have been asked to perform campaign tasks during the workday. It has always been understood, per numerous conversations with Judge Jameson and I, that campaign projects are separate from my duties as a staff attorney. I have always consented to participating in any campaign tasks. Any suggestion otherwise is meritless.

Norman's subsequent testimony before the JCC regarding this issue was entirely consistent with his letter. Specifically, he testified as follows in response to questioning by the JCC panel:

**JCC Panel:** And do you help judge on his campaign?

**Norman:** I do.

**JCC Panel:** And did he ask you to do that, or did you volunteer?

**Norman:** I volunteered. That was one of my main talking points in the interview for the job. I had a background in political science from Georgetown so I have an interest in politics, and he told me that it would be an election year in my time here. From the very beginning I said I would be happy to help him with his campaign because it's a great experience for whatever I do later on down the road.

Norman further testified that none of his work for Judge Jameson's campaign was done during his work hours as a staff attorney.

Thus, the evidence concerning Norman did not prove by clear and convincing evidence that Judge Jameson made a direct request that Norman provide volunteer work for his campaign in violation of SCR 4.1(A)(8). Rather, Norman was made aware of Judge Jameson's judicial campaign and volunteered to help, on his own time, due to his personal interest in politics and a desire to acquire knowledge on how to run a campaign. For the same reasons, Judge Jameson also did not run afoul of SCR Rule 4.1(A)(10).

Based on the foregoing, the JCC did not prove by clear and convincing evidence that Judge Jameson committed the misconduct it alleged under Count IV. This Court therefore orders that Count IV be dismissed and will not

73

consider the alleged misconduct under Count IV in deciding an appropriate sanction.

**5) *Count V***

The JCC found under Count V that Judge Jameson "repeatedly attempted to obstruct justice and impede the [JCC's] authority to investigate the charges against him. Specifically, that Judge Jameson intimidated and attempted to interfere with his judicial staff complying with a [JCC] subpoena." The JCC's findings were as follows:

> On September 21, 2022, upon request by Counsel for the [JCC], the Commission issued a subpoena for Kentucky Court of Justice [(KCOJ)] records. . . Judge Jameson's counsel was provided a copy of the subpoena upon service.

> On September 26, 2022, Judge Jameson contacted his administrative support specialist Sarah Gipson via telephone to discuss the subpoena. In short, Judge Jameson instructed his
>
> judicial staff to act in contradiction to their duties and responsibilities as AOC employees, specifically by calling the office and telling the staff not to turn over any subpoenaed documents and to call him if anyone came to the office to pick up the documents.[31]

---

[31] Citation to the record and footnotes omitted.

The JCC found that this alleged misconduct violated Canon 1, Rule 1.1;[32] Canon 1, Rule 1.2;[33] Canon 1, Rule 1.3;[34] and Canon 2, Rule 2.12(A).[35]

Upon this Court's review of the record, there was not clear and convincing evidence that Judge Jameson told his judicial staff not to comply with the JCC's subpoena. Further, the evidence showed that Judge Jameson's primary concern was ensuring that non-responsive, confidential documents in his office not be turned over because they contained documents he had been working on in response to the JCC's charges against him.

Gipson testified that on September 26, 2022, after the subpoena had been issued, Judge Jameson called her while she was in the office gathering responsive documents to the subpoena. She testified that "[t]he documents in his office were what he asked me not to turn over, essentially, that that's what [the JCC] was not allowed to have." During her direct examination, when asked how the call made her feel, she testified:

> I took it that he did not want me to comply with that request, at least until he worked on something with his attorney. I was under a court order from that subpoena, so I felt like I needed to comply even though he basically asked me not to. He never said the words 'don't comply,' but that's what I understood him to be asking me.

---

[32] "A judge shall comply with the law, including the Code of Judicial Conduct."

[33] "A judge shall act at all times in a manner that promotes public confidence in the independence, integrity, and impartiality of the judiciary, and shall avoid impropriety and the appearance of impropriety."

[34] "A judge shall not abuse the prestige of judicial office to advance the personal or economic interests of the judge or others, or allow others to do so."

[35] "A judge shall require court staff, court officials, and others subject to the judge's direction and control to act in a manner consistent with the judge's obligations under this Code."

On cross-examination, Gipson again confirmed that Judge Jameson never told her not to comply with the subpoena:

> **Counsel:** And I've wrote down, listening to your testimony, he never told you not to comply with that subpoena.
>
> **Gipson:** That's correct.  He never said those words.
>
> **Counsel:** He never told you that you are not to comply with the subpoena.
>
> **Gipson:** That's correct, not in those words.
>
> **Counsel:** Well, anything else might have been your interpretation of those words, but he never uttered those words.
>
> **Gipson:** Right.

Landon Norman stated at least twice during his testimony before the JCC that Judge Jameson never told him not to comply with the subpoena.  Rather, Judge Jameson's only concern was that the confidential documents in his office that he had been working on in response to the JCC's charges against him not be turned over.  This was further supported by an email sent to Gipson and Norman from AOC's Deputy General Counsel on September 27 which said:

> I spoke with Judge Jameson yesterday regarding the record production the KCOJ is undertaking.  I think he had been provided some inaccurate or incomplete information about our record production, so I wanted to make sure you all understood what we've asked of you with respect to document production.  You do not need to produce any document that is not responsive to the JCC's subpoena.  We do not want any document that is personal or otherwise unrelated to the scope defined by the JCC's subpoena. **With respect to any document or record that has been boxed up from Judge Jameson's office, we do not need the document scanned unless it is responsive to the subpoena** and those
>
> boxes should not be removed from that office in response to this subpoena or for any other reason while the JCC case is pending.  Judge Jameson was relieved to know that you all would be

reviewing the documents for responsiveness before producing them **and that the boxes in his office would not be removed**.

(Emphasis added). Gipson responded to the email: "Thank you! Judge Jameson called our office yesterday and asked that I not turn those things over so I really appreciate that clarification."

To be sure, it was wholly improper for Judge Jameson to contact his judicial staff at that time because the JCC's temporary removal order had not yet been voided. But the misconduct of contacting his judicial staff while subject to the JCC's temporary removal order was charged under Count VI below. The misconduct alleged under Count V was that Judge Jameson "repeatedly attempted to impede and obstruct" the JCC's investigation by intimidating and attempting to interfere with his judicial staff's compliance with the JCC's subpoena. Neither Gipson nor Norman testified that Judge Jameson told them not to comply with the subpoena and, in fact, both stated multiple times that he *did not* tell them not to comply with the subpoena. Gipson testified before the JCC that she interpreted what Judge Jameson said during the September 26 phone call to mean that she should not comply with the entirety of the subpoena, even though she acknowledged he never said those words. But the email response she sent to counsel for AOC the day after her conversation with Judge Jameson demonstrated that, at that time, she understood his request to mean the boxes of confidential, non-responsive documents in his office.

77

Also included under Count V, the JCC found that Judge Jameson's staff attorney Landon Norman felt threatened by a Facebook post made by Judge Jameson's wife during the time that Norman was cooperating with the JCC's investigation. The post said, in pertinent part, "[W]hile persons are free to state their opinion, YOU CAN BE SUED FOR STATING FACTS THAT ARE NOT TRUE. There is already a long list of people that fall in that category and will have to face their recklessness when all is said and done." As it was undisputed that Judge Jameson did not make this post, he cannot be found to have committed misconduct for posting it. While SCR 2.12(A) directs that "[a] judge shall require court staff, court officials, and others subject to the judge's direction and control to act in a manner consistent with the judge's obligations under this rule[]" there is no concomitant duty that applies to a judge's spouse. Moreover, Norman testified that he does not have a Facebook account. This Court therefore fails to see how the post could have been intended by Judge Jameson as a direct threat towards Norman meant to intimidate him into non-compliance with the JCC's investigation.

Based on the foregoing, the JCC failed to prove the allegations in Count V by clear and convincing evidence. This Court therefore orders that Count V be dismissed and will not consider the alleged misconduct under Count V in determining an appropriate sanction.

**6) *Count VI***

Count VI alleged that Judge Jameson failed to adhere to the terms of the JCC's temporary suspension order by contacting his judicial staff and availing himself of judicial resources. In addition to contacting two members of his staff, as discussed in Count V, the JCC also alleged that Judge Jameson continued to use his AOC email and computer.

However, as previously discussed, the JCC's temporary suspension order was declared *void ab initio* by this Court because it was not supported by the minimum number of votes that SCR 4.120 requires. Accordingly, any alleged misconduct based on Judge Jameson's failure to adhere to that order is now moot. The JCC itself acknowledges that Count VI is moot and that it therefore did not consider Count VI determining its recommended discipline. This Court will likewise not consider it.

**7) *Count VII***

Count VII alleged acts of misconduct in relation to a security video of Judge Jameson recorded in the Marshall County courthouse. In particular, his attempt to coerce MSU's radio station manager into not pursuing a story about the video, and his retaliatory acts against a courthouse security officer who he believed released the video.

The video, captured on February 11, 2022, at approximately 6:35 am, depicted Judge Jameson walking downstairs from his chambers to an employee entrance in a t-shirt, boxers, and socks. After a short interaction with his wife and two children at the employee entrance, he walked back up

the stairs toward his office. A short time later one of the building's janitors walked down the same flight of stairs. A rumor soon began to spread amongst courthouse employees about the judge walking around the courthouse in his underwear. This rumor eventually made its way to Marshall County Judicial Center Lead Court Security Sergeant Jeff Daniel. As head of security, one of Sergeant Daniel's duties was to investigate unusual occurrences in the courthouse. He therefore pulled a copy of the video and brought it to the attention of his administration; it was determined that nothing criminal occurred. The rumor then spread, as rumors often do, beyond the walls of the courthouse and two open record requests were filed for access to the video. One request was filed by an individual from WPSD, a television station in Paducah, and the second was filed by WKMS, an MSU public radio station. Both of the requests were denied by AOC prior to April 11, 2022.

On April 11, 2022, Judge Jameson emailed Chad Lampe, the station manager of MSU's radio station and asked Lampe to call him. On the following day, Lampe called Judge Jameson. Lampe testified that their conversation went as follows:

> The conversation started off nice and fine. . . And then he inquired about the open records request. He mentioned to me that the request also had received an appeal after the denial, which I don't believe that was the case, that we did appeal. And then the judge had mentioned that he had already called Dr. Jackson, the university president, and that he was not happy.

Judge Jameson then conceded to Lampe that there likely was a video of him walking around the courthouse in his underwear. He explained that he sometimes works late and sleeps on a couch in his office, and that the video in

question would show his wife dropping off one of their children so that Judge Jameson could take the child to a medical appointment that day. Lampe testified that

> [Judge Jameson] had also mentioned that he wanted to make sure that it wasn't going to be a story and I told him that I don't make the decision on stories, our news director and our journalists make the decision because we have a firewall for those editorial decisions. And he wanted me to assure him that it wouldn't be a story.

Lampe told Judge Jameson he would call the news director and inform him that, based on what the judge had told him about the video, it did not appear to rise to the level of a news story. The news director agreed, and Lampe called Judge Jameson a second time to inform him that they did not intend to pursue the story and asked him to inform the university president of that decision. When counsel for the JCC asked Lampe if he believed Judge Jameson was trying to intimidate him by telling him that the university's president was not happy about the open records request he responded, "Oh certainly."

Lampe was later instructed by his supervisor, the Dean of MSU's College of Business, to detail the conversation he had with Judge Jameson in an email to MSU's Provost, who answers only to the university's president. Lampe did so in an email dated April 14, 2022, that recounted in pertinent part:

> WKMS requested to view the footage via the FOIA[36] request with [AOC], the request was denied. There has been no appeal by WKMS. Judge Jameson emailed me on Monday evening asking me to call him. I did, first thing Tuesday. We discussed the request. . . He said he called Bob Jackson about the request, before he called me. I asked that he call Dr. Jackson back to explain that there

---

[36] Freedom of Information Act.

81

would be no story.  He wanted me to confirm that there would be no story, and I called our News Director to confirm there would be no story, then I called [Judge Jameson] back and informed him there would be no story. . . [T]his isn't a story for us, and it was solved on Tuesday of this week and would have been solved without a call to Dr. Jackson.

Lampe left his employment with MSU two months later.  He testified that, although the incident with Judge Jameson was only one of several factors that led to his resignation, "it accelerated [his] departure."  He brought the incident to the attention of the JCC voluntarily once he learned of the JCC's investigation because he felt that Judge Jameson's actions were unethical.

During the same week of April 11, 2022, Judge Jameson sought to affect the employment of Sergeant Daniel for engaging in the investigation that uncovered the video.  Even though part of Sergeant Daniel's duties included investigating unusual events and happenings in the judicial center, Judge Jameson was adamant in his testimony before the JCC that Sergeant Daniel's review of the video was outside the scope of his duties.  Judge Jameson went so far as to testify that his conclusion was supported by AOC policy and that AOC was "not very happy" with Sergeant Daniel's actions.  This claim was not borne out by the evidence.

On or around April 12, 2022, the same day Judge Jameson first spoke with Lampe, he sent texts to Marshall County Sheriff Eddie McGuire to complain about Sergeant Daniel.  Those texts said:

Need to talk about Sergeant Daniel.

I need him out of the building if possible.  He is using state resources to sit, on what I believe is work time, to review security videos to see if he can find anything that can make me look bad

82

and then is either by himself or in coordination with one or two clerks, calling media sources and making a news tip regarding the contents of the security videos which, as you know, are confidential. He is doing this in support of my opponent. You can imagine how that makes me feel. I'd really like to talk to you about it before I take any action.

When Sheriff McGuire did not respond to this text immediately, Judge Jameson sent a substantially identical text to the sheriff's chief deputy. The chief deputy understood Judge Jameson's texts to be a complaint against a law enforcement officer pursuant to KRS 15.520(3)(a)[37] and began a formal investigation. A formal investigation report dated April 13 concluded that the complaints against Sergeant Daniel were unfounded, and that a change in his position could not be made absent proof of misconduct. The report further noted that Sergeant Daniel "lives outside the county and cannot vote for either candidate and in fact is planning on retiring before the election and would not be working with whoever wins."

After Judge Jameson's complaint against Sergeant Daniel failed to bring about his removal from the courthouse, he persisted in his attempts by telling Sheriff McGuire that he was afraid Sergeant Daniel might "plant evidence" or "do something in his courtroom." These subsequent complaints succeeded in having Sergeant Daniel removed from the courthouse, as the sheriff reassigned him to the general investigation division. The sheriff explained that although

_____

[37] KRS 15.520(3)(a) provides that "[a]ny complaint taken from a citizen alleging misconduct on the part of any officer shall be taken as follows . . . If the complaint alleges criminal activity by an officer, the allegations may be investigated without a signed, sworn complaint of the citizen[.]"

he had no reason to believe Judge Jameson's concerns would come to fruition, Sergeant Daniel only had 45 days left until his retirement and that he was an "old school," "chain of command" officer that would not attempt to fight the decision to reassign him. He further testified that he would not have reassigned Sergeant Daniel but for Judge Jameson's complaints.

Based on the foregoing, the JCC found that Judge Jameson violated **Canon 1, Rule 1.1:** "A judge shall comply with the law, including the Code of Judicial Conduct"; **Canon 1, Rule 1.2:** "A judge shall act at all times in a manner that promotes public confidence in the independence, integrity, and impartiality of the judiciary, and shall avoid impropriety and the appearance of impropriety"; **Canon 1, Rule 1.3:** "A judge shall not abuse the prestige of judicial office to advance the personal or economic interests of the judge or others, or allow others to do so."

Based on our review of the record, we hold that the JCC proved by clear and convincing evidence that Judge Jameson committed the misconduct alleged under Count VII and violated Rule 1.1, Rule 1.2, and Rule 1.3.

## F. Appropriate Sanction

As a final matter, we must determine whether the JCC's ruling to permanently remove Judge Jameson from office was appropriate.

We begin with the issue of whether the JCC had the authority to permanently remove Judge Jameson from office. The JCC's supplemental findings and order states:

> It is the [JCC's] conclusion and ruling that Judge Jameson is unfit
> for the judicial office he currently holds and is equally unfit to

84

serve in judicial office in the indeterminate future. Therefore, the [JCC] hereby reaffirms is ORDER that Judge Jameson be, and here by is, REMOVED from judicial office for the term he then held, and that this same unfitness disqualifies judge Jameson from holding office in the indefinite future. The Commission believes it has a good faith basis under *Gordon v. Judicial Conduct Commission*, [655 S.W.3d 167, 172 (Ky. 2022)], to find and conclude that Judge Jameson should be permanently removed from judicial office because the totality of the clear and convincing evidence presented at the Temporary Suspension Hearing and Final Hearing and as set forth herein establishes that he was unfit and remains unfit for judicial office.

Despite the quoted language above, the JCC argues on appeal to this Court that its order does not state that he is disqualified from ever holding public office again, but rather is limited to him being prohibited from seeking election to the office of judge for the 42nd Judicial Circuit. The JCC therefore contends that its decision does not encroach upon the legislature's impeachment powers.

While this Commonwealth's Constitution grants the JCC the authority to retire, suspend, or remove a judge,[38] it places the authority to impeach an elected official solely in the hands of the legislature by simply stating that "[t]he impeachment powers of the General Assembly shall remain inviolate." Ky. Const. § 109. In particular, the House of Representatives has the sole power of impeachment, and all impeachments must be tried by the Senate. Ky. Const. §§ 66, 67. The Governor and all civil officers are subject to impeachment "for any misdemeanors in office; but judgment in such cases shall not extend further than removal from office, and disqualification to hold any office of honor, trust or profit under this Commonwealth[.]" Ky. Const. § 68.

---

[38] Ky. Const. § 121.

While we acknowledge that the JCC now claims its only intention was to prevent Judge Jameson from holding the office of judge for the 42nd Judicial Circuit, nothing about the language of its order is so limited. And, while the JCC certainly had the authority to remove Judge Jameson for the remainder of his term,[39] this Court has never addressed whether a judge's removal may extend beyond that period either for an indefinite period or permanently. The JCC's reliance on *Gordon* is somewhat puzzling, as Judge Gordon was not permanently removed from office, nor does that opinion address whether permanent removal from office is a sanction that is available to the JCC. Regardless, to interpret the JCC's removal power under Section 121 to include permanent removal from office encroaches upon the impeachment powers vested solely in our legislature. The only safe harbor when interpreting foundational governmental roles is a "strict [adherence] to the separation of powers doctrine,"[40] a bedrock principle provided for explicitly by our Constitution.[41] Ky. Const. §§ 27, 28. In accordance with those principles, we conclude that the permanent removal of a state official elected by the people must be the result of actions taken by a body of representatives also elected by the people: our legislature.

---

[39] *Kentucky Judicial Conduct Com'n v. Woods*, 25 S.W.3d 470 (Ky. 2000) (holding that "the remedy of removal disqualifies a former judge from judicial office for at least the remainder of the current term.").

[40] *Diemer v. Commonwealth, Transp. Cabinet, Dept. of Highways*, 786 S.W.2d 861, 864 (Ky. 1990).

[41] Ky. Const. §§ 27, 28.

With that established, we must decide whether Judge Jameson's removal from office was an appropriate sanction. "Typically, removal stems from a deliberate course of action or numerous examples of separate violations of the Code of Judicial Conduct." *Gordon*, 655 S.W.3d at 193 (citing *Gentry*, 612 S.W.3d at 847). Judge Jameson's misconduct in this case certainly meets that standard.

To summarize, the evidence demonstrated by clear and convincing evidence that Judge Jameson committed numerous, intentional, and varied acts of misconduct across four counts of misconduct. Under Count I, the JCC proved that Judge Jameson created the CCB in a manner and for a purpose that did not comply with the statutory mandates surrounding community corrections programs and boards; that he, or persons under his direct supervision, developed local rules and procedures concerning the operation of a pre-trial ankle monitoring program without the approval of the Chief Justice; that he made improper appearances before two legislative bodies; that he improperly interfered with and affected the fairness of a public bidding process; that he engaged in two acts of direct solicitation of donations to the Re-Life project; and that he submitted an application for grant money on behalf of the CCB for an improper purpose.

Under Count II, the JCC proved that Judge Jameson used at least one of his KCOJ employees to perform work for the CCB; that he received direct notifications for violation alerts and on more than one occasion issued arrest warrants upon receipt of a notice of violation report from an employee of his

87

corporation; and that, in his capacity as judge, he ordered individuals to participate in an ankle monitoring program that in turn required participants to pay his nonprofit corporation for the privilege of using the ankle monitor while he was simultaneously involved with the corporation's finances.

Under Count III, the JCC proved that Judge Jameson violated the doctrine of separation of powers by ordering defendants to participate in an ankle monitoring program in his judicial capacity and thereafter being an integral part of monitoring those defendants, a function that is traditionally exclusive to the executive branch; that he pressured an attorney who regularly practiced before him to file a bar complaint against another attorney that regularly practiced before him; and that he engaged in two acts of retaliation.

Finally, under Count VII, the JCC proved that Judge Jameson acted in a manner that did not promote public confidence in the integrity of the judiciary, created the appearance of impropriety, and abused the prestige of his office to advance his personal interests by having a security officer reassigned from the Marshall County courthouse and by pressuring a radio station manager not to pursue a story about an embarrassing video of him.

The foregoing misconduct involved numerous violations of several canons and rules of judicial conduct including: Canon 1, Rule 1.1; Canon 1, Rule 1.2; Canon 1, Rule 1.3; Canon 2, Rule 2.1; Canon 2, Rule 2.2; Canon 2, Rule 2.4(B); Canon 2, Rule 2.9(C); Canon 2, Rule 2.12(A); Canon 2, Rule 2.8(B); Canon 3, Rule 3.1(A); Canon 3, Rule 3.1(C); Canon 3, Rule 3.1(D); Canon 3, Rule 3.2; Canon 3, Rule 3.7(A)(4); and Canon 3, Rule 3.7(A)(6)(a).

Judge Jameson's misconduct and violations of the canons "[were] not isolated but [constituted] a pattern of repeated conduct over an extended period of time . . . and in a variety of ways." *Gordon*, 655 S.W.3d at 194. It is also significant that, prior to the JCC proceedings addressed herein, Judge Jameson appeared before the JCC three times between January 2016 and June 2021. According to the JCC, the 2016 complaint "raised strikingly similar issues involving an out-patient [SUD] treatment program, the judge's use of social media to endorse that program, his active participation in the program, his ordering defendants to participate the program, and family members involved in running the program." That complaint resulted in no disciplinary action but the JCC's letter announcing its decision cautioned Judge Jameson to pay particular attention to Canon 1, Rule 1.3; Canon 2, Rule 2.4; and Canon 4, Rule 4.1(A)(2)-(3). The second and third complaints, ostensibly, resulted in private reprimands.

Based on the foregoing, we agree that the removal of Judge Jameson from office was an appropriate sanction.

### III. CONCLUSION

Based on the foregoing, the JCC's findings of fact, conclusions of law, and order and its supplemental findings of fact, conclusions of law, and order are affirmed in part and reversed in part.

VanMeter, C.J.; Bisig, Conley, Keller, Lambert and Thompson, JJ., sitting. Conley and Keller, JJ, concur. Thompson, J., concurs with separate opinion. VanMeter, C.J., concurs in part and dissents in part by separate opinion, in

89

which Bisig, J. joins. Bisig, J., concurs in part and dissents in part by separate opinion. Nickell, J., not sitting.

THOMPSON, J., CONCURRING: I concur with the majority opinion's disposition of the charges and strongly agree that there is overwhelming evidence that Judge Jameson is guilty of an extremely flagrant appearance of a conflict regarding his irreconcilable dual roles as a judge and administrator of the Community Correction Board (CCB).

I write separately to address my concerns that in this particular case, it appears that the disciplinary process of the Judicial Conduct Commission (JCC) was mustered for an inappropriate purpose, swaying a judicial election.

I have great respect the often-thankless task that the JCC undertakes in investigating complaints of judicial misconduct. Having watched numerous hours of the various hearings involved in Judge Jameson's discipline case myself, I understand the incredible devotion that is required.

Judge Jameson's first defense document alleged that there was substantial evidence that the complaints made against him to the JCC were prompted by his political opponent or others acting on her behalf. The purpose of such actions was to discredit him for the tactical reason that it would make it easier for her to defeat him at the ballot box.

The Commission and the majority opinion both fail to analyze or address the issue of this alleged conspiracy and the alleged manipulation of the JCC during an election year, despite the fact that the JCC states that, even as it was investigating complaints against Judge Jameson, additional complaints

90

continued to be made. Having reviewed the evidence, there was clear and convincing proof that at least some complaints were being made for the express purpose of influencing the outcome of the judicial election.

Judge Jameson faced considerable opposition since taking office. Calloway County Circuit Clerk Avery opined:

> From nearly day one of his judgeship, a small group of attorneys have been whispering gossip that somehow Judge Jameson must be doing something corrupt because nobody cares enough about people to put in hundreds, if not thousands of volunteer hours and spend thousands of dollars of their own money to help make these ideas come to life. Just because these attorneys would never put in the passion and hard work regarding battling addiction that Judge Jameson does, doesn't mean they are "right", and he is "wrong." Judge Jameson is strongly supported by the majority of our local legal community because they believe him to be authentic, passionate about people, and fair. The only people consistently critical of Judge Jameson make up the same small group that have been unaccepting of his approach to the job from day one.

Jameson's Exhibit 17.

After his political opponent filed to run for Judge Jameson's seat, Judge Jameson began to receive reports from other lawyers that there was an active campaign to enlist and recruit lawyers to: (1) file complaints against him; and (2) state on Facebook the total number of complaints that had been filed against him. This was being done to bolster his political opponent's chances of winning the election. In Judge Jameson's answer to the JCC, he explained that he believed the JCC disciplinary process was being abused by claimants as part of an organized plot, explaining he had been told about this plot by at least three attorneys.

The JCC did not just have Judge Jameson's word to support such a conspiracy. There were many indications which provided the JCC with confirmation that this was in fact occurring.

Judge Jameson specifically quoted from a recorded interview by an attorney witness who testified before the JCC investigator. That witness stated that she was approached by an attorney who "indicated to me that, they [as in multiple people] were planning to file multiple judicial complaints against Jameson in the hopes of bolstering [his political opponent's] chances of winning the Judicial seat" and the attorney stated she had filed or helped to file a complaint against Judge Jameson.

> Then she looks me right in the eye and said "we really need a third party that's a disinterested party to get on Facebook and talk about the fact that all these complaints are being filed, once they get filed . . ." I'm like "good luck finding someone." In other words, I pass, you know. I don't want to be involved in something like that, and she asked me did I know anyone, could I think of anyone that I could direct her to that could, could do that for them and I, of course said "no."

Lisa DeRenard, whom the JCC found to be a very credible witness, testified before the JCC that she was also recruited for the same purpose, to post the number of complaints on Facebook. Although DeRenard's testimony supported the existence of a conspiracy to support Judge Jameson's political opponent by filing JCC complaints against him, under Count III, the JCC concluded that Judge Jameson's request that DeRenard file a bar complaint regarding the attorney attempting to organize this scheme was an attempt to pressure her and constituted misconduct on his part.

92

Judge Jameson, in his Exhibit 20, filed printouts of several Facebook posts from his political opponent. She posted that Judge Jameson had forty-five complaints pending against him before the JCC. Only the JCC knows the number of complaints filed against Judge Jameson and it has never stated how many there were, whether multiple complaints were filed regarding the same incidents, or if the judicial discipline process involved all the complaints filed or a subset of them. If this figure is correct, I can only conclude there is overwhelming evidence of a conspiracy to file complaints against Judge Jameson and that someone was collecting reports regarding the filing of these confidential complaints; if this figure is false, I can only presume that his political opponent was attempting to manipulate the election through spreading false information. It is also unclear whether any of the people who filed complaints were ever called to testify before the JCC.

Judge Jameson's political opponent also repeatedly attacked Judge Jameson in her Facebook posts for being a horrible person and judge, giving various examples that she claimed proved he was a bully. She repeatedly referred to an incident in which she appeared before Judge Jameson as counsel for William McAlpin, regarding allegations that Judge Jameson committed misconduct in relation to exercising the judicial contempt power, as Judge Jameson was "threatening to put me on the jail line[.]" Jameson's Exhibit 20. The civility normally present in most judicial races was noticeably lacking in her conduct.

It is unclear whether Judge Jameson's political opponent or someone else filed a JCC complaint against Judge Jameson for inappropriately threatening her with contempt, but his political opponent was not called to testify before the JCC regarding such a claim. Having reviewed the video of the hearing regarding McAlpin's plea which contained the conduct at issue, I conclude that Judge Jameson acted appropriately, given all the circumstances.

In his answer to the JCC, Judge Jameson questioned "[t]he timing of these multiple claims made in a short time period" which were distant in time as "curious at best and more likely intentionally part of the conspiracy to damage Judge Jameson's reputation in a desperate attempt to provide his opponent with a much-needed political boost." (Emphasis omitted). He was not the only one to question the timing of the filing of these complaints. Circuit Clerk Avery noted: "Even the timing of the most recent complaint seems considerably suspect due to this being an election year." Jameson's Exhibit 17.

I consider this conduct extremely serious. An attempt to utilize a completely non-partisan commission to further political motives is improper and should be addressed. The JCC has oversight over Judge Jameson's political opponent pursuant to Canon 4 as she was a judicial candidate. Judicial candidates are not allowed to "knowingly, or with reckless disregard for the truth, make any false statement of material fact" and are required to "take reasonable measures to ensure that other persons" do not do so "on [her] behalf[.]" Rule 4.1(A)(11), (B). The issue of "dirty tricks" should have been addressed by the JCC.

I believe if a flurry of complaints is suddenly made in an election year, the JCC should view such complaints with caution. It should also view with a more critical eye any complaints that are not made by the person against whom the misconduct is alleged to occur, or which involve events which occurred years earlier.

The actions of the JCC combined with the concurrent publicity surrounding them, were undoubtedly pivotal in Judge Jameson losing his 2022 reelection bid. The final hearing regarding Judge Jameson was held on October 17-20, 2022. The JCC's Final Order which removed Judge Jameson from office was entered on November 4, 2022, just days before the general election which was held on November 8, 2022.

I also have additional concerns about the JCC's process regarding Judge Jameson. Judge Jameson alleged he was questioned at an informal hearing (which was held prior to the temporary removal hearing), without previously being provided with adequate notice regarding the charges about which he would be questioned. Therefore, he could not review any records to help refresh his memory about the incidents at issue. This informal hearing is not part of the record. Judge Jameson raises the concern that when having to respond purely based on his memory of certain incidents, some of which occurred much earlier in time, his inability to perfectly recall the incidents at issue was being used as proof by the JCC that he was obfuscating when he was in fact trying to fully cooperate with the JCC.

While at this stage any such errors are moot, I am concerned that such conduct could be capable of repetition yet evade review. Failing to advise Judge Jameson about the topics under consideration, if true, would be improper.

Similarly, and more egregiously, it is improper for the JCC to find misconduct based on matters that were never charged. No allegation of bid rigging or improper use of his judicial contempt powers was contained in any of the charging documents at any time, yet extensive findings were made that he violated the canons through committing such actions. Had the majority opinion not determined that these findings were unsubstantiated, such error would have provided ample grounds for rejecting such findings.

This is not a typical judicial disciplinary case because it does not involve money or sex. Instead, it involves a judge spending a great deal of his personal time trying to do big things in a genuine effort to serve his constituents and the entirety of 42nd Judicial Circuit.

While I agree that Judge Jameson's misguided action in managing the CCB caused an extreme appearance of conflict, that does not mean that he did not act in good faith or have commendable goals. The JCC itself acknowledged that Judge Jameson had "altruistic intentions" which were "sincerely held and true" and that he had a "noble" goal in seeking to build a drug treatment center. Final Revised Order at 11, 89. Additionally, according to Circuit Clerk Avery, she and others agreed with Judge Jameson about the need for an

effective inpatient facility and appropriate GPS monitoring in the circuit and partnered with him to try to bring these ideas to fruition. Avery lauded Judge James's strong concern for those battling addiction but explained that he received opposition because he "ruffled feathers" by trying to address underlying addiction issues in his orders and while some local attorneys were won over to his approach, others proved intractable. Jameson's Exhibit 17.

As to ankle monitoring, Judge Jameson testified it always bothered him that only wealthy defendants could afford to be released from the county jail on GPS ankle monitoring supervision. Under the prior "Wild West" system, defendants had to arrange for their own GPS monitoring with one of three private and unregulated GPS vendors; this resulted in indigent defendants lingering in incarceration at a high cost to county government because the cost of ankle monitoring was prohibitive and the "arrange your own monitoring" scheme did not allow a reduced rate for GPS monitoring for those unable to pay the full amount. This resulted in discriminatory disparate outcomes depending upon ability to pay.

Additionally, defendants who could afford GPS monitors were having trouble getting them placed and removed in a timely manner, and the equipment was not always reliable. Jameson's Exhibit 4, Appx. E. As one attorney explained: "The ankle monitors themselves were second rate. The batteries would continually run down. My clients would have problems nonstop with the devices. They were easily tampered with and could be cut off with a simple pair of scissors." Jameson Exhibit 4, Appx. R. at 2 (Affidavit of Mitchell

T. Ryan). There were also problems with the companies overseeing the monitoring being difficult to contact, reporting violations sporadically and the Commonwealth was not getting any information about violations. *Id.*

Judge Jameson investigated several GPS suppliers, and he decided that the GPS ankle monitor from the Track Group had objectively superior features. The Track Group's monitor was virtually indestructible and would report any attempt to remove it, and it allowed two-way communication.

Additionally, I believe Judge Jameson was rightfully excited about the Track Group monitoring software which had the potential to save lives by monitoring the movements of defendants. Not only was there an inclusion zone for a defendant to remain within under limited confinement by ankle monitor, there was also an exclusion zone. A person protected by a no contact order could download an application via cell phone and if the defendant entered a zone within a certain distance from that protected person, the protected person and the GPS Supervisor would be notified immediately on their phones. Jameson's Exhibit 4, Appx. R. at 3. Judge Jameson testified that he worked out an arrangement that if a monitored defendant committed a class one violation, he could contact local law enforcement who would respond within minutes of his report. This rapid response could allow a defendant encroaching on a zone of exclusion to be picked up before the defendant could reach or harm a victim, a much superior system to a victim having to call 911 when confronted by a defendant and subject to immediate harm. Defendants

knowing about this system could also deter violations from being committed in the first place.

Ultimately, the fiscal courts agreed that the Track Group product was superior and specified in their request for proposal (RFP) that this was the product they wanted. It is not unusual for fiscal courts to specify the appropriate parameters of what they are seeking. Those who will be impacted by what is purchased, often provide very specific input to fiscal courts and recommend specific products as being the best technology to meet their needs. The County Attorney testified that there were well-attended public hearings to consider whether and what kind of GPS monitoring system they wished adopted, the process took a long time, and each fiscal court conducted their own investigations and consulted with the Commonwealth Attorney, judges, the jail, and other interested parties before finalizing the RFP. Apparently after engaging in all this work, they concurred that Judge Jameson had indeed found a superior and more cost-effective GPS system.

It is not improper for fiscal courts to take into account a judge's recommendations as to which monitoring system would be most suitable. While unpublished therefore not authoritative, *Software Tech., Inc. v. Farris*, 2008-CA-001678-MR, 2010 WL 1253211 (Ky. App. Apr. 2, 2010) (unpublished), explains that the involvement of parties who will be affected by the end result of the bidding process is not prohibited and is instead appropriate and confirms it is appropriate to change course in favor of new

technology which will better serve the needs of those intended to benefit. I agree with its reasoning.

Adopting a unified system generally, through the Track Group's product specifically, was beneficial to all concerned parties because it: (1) enabled more defendants to be released, thus saving jail costs; (2) lowered the cost overall for defendants being placed on global position monitoring, thus allowing more defendants to participate in such monitored release enabling them to work; (3) reduced the inefficiency of defendants having to arrange for their own monitoring; (4) was superior in its ability to monitor these defendants than the private global position monitoring heretofore provided by private companies; and (5) would not discriminate against impoverished defendants who would be granted a lower fee. This was a win-win scenario. The only parties not to benefit were the other vendors who wished to either maintain the profitable status quo or become the new authorized vendor of ankle monitors but did not have a product that was nearly as cost-effective or offered the options that the Track Group's product did. The only reason there was an impropriety in Judge Jameson's actions was because of the conflict between his roles.

While at one time Judge Jameson anticipated using profits from the ankle monitoring to support the building on an inpatient treatment center, ultimately the low fees charged did not result in any profit which could be used in such an endeavor. As witnesses testified, there was simply no profit in operating the ankle monitoring wing of the CCB and Judge Jameson was never paid for his services to it. While the appearance of impropriety was extreme, the

JCC never made any findings that Judge Jameson either placed any defendant on ankle monitoring or removed a defendant from such monitoring for an improper purpose.

Prior to the JCC hearing, Judge Jameson divested from his role with the CCB and no longer has any involvement with it. *See* Jameson Exhibit 4, Appx. R. (Affidavit of Mitchell T. Ryan, current CCB president). Judge Jameson explained that he planned to withdraw from the CCB immediately upon it beginning its ankle monitoring operation. He knew he should not be involved in its receipt of funds or any management of it. He did not follow through with those plans, likely because no one else wanted to take over the thankless job of administering it for free.

Circuit Clerk Avery also commented that she and the other circuit clerks voluntarily participated in collecting fees for the CCB, which was not an imposition as they already collected fees for CrimeStoppers. She did not think there was anything wrong with this, and there was evidence that the Court of Justice made software changes to facilitate this process, thus providing at least tacit support for this method of collecting fees, despite prior advice recommending to Judge Jameson that the clerks not collect such fees.

It is true that Judge Jameson made many missteps in his attempts to serve his community but there is no proof that those mistakes came from anything other than his selfless zeal for the plight of impoverished and drug dependent Kentuckians. The JCC's role is to correct, not irredeemably punish, a judge's behavior when possible. *See Kentucky Jud. Conduct Comm'n v.*

*Woods*, 25 S.W.3d 470, 473 (Ky. 2000) ("it is not the role of the Commission to stigmatize or punish judges. The Commission's role is to improve the quality of justice by hearing specific complaints of judicial misconduct and taking the least severe action necessary to remedy the situation").

Given Judge Jameson's largely exemplary record and divestment of his interest in the CCB, with this conflict being the primary basis for most of the substantiated complaints against him, this shows that he understood how he had erred and was amenable to correction. While the JCC's decision to remove Judge Jameson from office may have been appropriate considering how little time was left in his term, its decision to permanently bar him from serving as a judge would have been inappropriate, even if the majority opinion had not determined such an action was unconstitutional.

VANMETER, C.J., CONCURRING IN PART AND DISSENTING IN PART: I agree that the JCC sufficiently proved by clear and convincing evidence that Judge Jameson committed most of the misconduct alleged against him. I also agree that removal is an appropriate sanction. However, based upon my review of the record and my understanding of our ethical canons, I would find that the JCC met its burden with respect to two instances the majority found lacked sufficient support: (1) the solicitation of campaign "support" from attorney DeRenard and (2) instructing his judicial staff to violate the JCC subpoena.

"Clear and convincing proof does not necessarily mean uncontradicted proof. It is sufficient if there is proof of a probative and substantial nature carrying the weight of evidence sufficient to convince ordinarily prudent-

minded people[.]" *Gentry v. Judicial Conduct Comm'n*, 612 S.W.3d 832, 846 (Ky. 2020). But although we have broad power to "affirm, modify or set aside in whole or in part the order of the Commission, or to remand the action to the Commission for further proceedings", SCR 4.290(5), we are nevertheless bound to "accept the findings and conclusions of the commission unless they are clearly erroneous; that is to say, unreasonable." *Maze v. Judicial Conduct Comm'n*, 612 S.W.3d 793, 800 (Ky. 2020) (quoting *Wilson v. Judicial Ret. & Removal Comm'n*, 673 S.W.2d 426, 427–28 (Ky. 1984)).

In neither instance were the allegations of improper solicitation or violation of the subpoena clearly erroneous. As to solicitation, Judge Jameson's failure to explicitly ask DeRenard to make a financial contribution to his campaign does not insulate from the charge. I do not believe our ethical canons are so rigid as to be so easily nullified by oblique requests. Judge Jameson called DeRenard personally to lay out his platform for re-election. His request for "support" was accurately interpreted by DeRenard as a request for a financial contribution, as confirmed by Judge Jameson when he clarified what he meant by support. Had Judge Jameson not indicated his desire for her financial support and informed DeRenard how to provide that support, DeRenard would not have financially contributed to Judge Jameson's campaign.

Judicial candidates are prohibited by our rules from "personally solicit[ing] or accept[ing] financial or in-kind campaign contributions" other than through their financial committees. Canon 4, Rule 4.1(8). To personally

103

solicit is to make "a direct request made by a judge or a judicial candidate for financial support or in-kind services, whether made by letter, telephone, social media, or any other means of communication." SCr 4.300, Terminology. Of course, this rule means that a candidate may not personally request financial contributions, or hand out envelopes for contributions, or in any other way directly bring to bear their personal clout to compel the giving of money. The rule also requires a candidate to demur when the topic of money is brought up. In this instance, when DeRenard broached the question of financial contributions, the proper response from Judge Jameson would have been simply to direct her to his financial committee or advise someone from his committee will be in touch; not suggest that such a contribution "would help."

Admittedly, the other instances of contact between DeRenard and Judge Jameson do not lend themselves to the allegation of improper solicitation. The December 2021 phone call, however, is sufficiently clear and convincing, by my estimation, to support the charge of misconduct. The JCC's finding with respect to Judge Jameson's improper solicitation of money from DeRenard was not "clearly erroneous; that is to say, unreasonable." *Maze*, 612 S.W.3d at 800.

Regarding the allegation that Judge Jameson directed his judicial staff to violate the JCC subpoena, I would also find that the JCC met its burden of proof. Judge Jameson acted improperly by contacting his staff in regard to the subpoena, but as with the improper solicitation, the fact that Judge Jameson never spoke the words, "do not comply with the subpoena" does not save him.

Again, I do not believe our ethical canons can only be broken by an unambiguous declaration of intent to break them.

We do not know precisely what Judge Jameson said to Gipson that led her to believe Judge Jameson was asking her to violate the subpoena, other than that he never explicitly told her to do so. Whatever was said, Gipson, Judge Jameson's administrative support specialist for his judicial office, interpreted it to mean that she should not comply with the subpoena. Gipson is not wholly ignorant of the law and, as a member of a judicial staff, possesses at least a passing familiarity with legal instruments, such as a subpoena. When she interpreted Judge Jameson's words as a directive to not comply, she did so fully aware of her legal obligations under the subpoena. Had Judge Jameson made abundantly clear that he was referring only to certain materials in boxes in his office, Gipson would have understood that.[42]

I would find the JCC provided clear and convincing evidence to support the charge. Gipson's response to Judge Jameson's directive is sufficiently clear to at least strongly suggest that she was told to not comply with the subpoena in some way, shape, or form. Accordingly, it was not unreasonable for the JCC to find Judge Jameson's actions violated our ethical canons.

---

[42] Gipson's response to an email from AOC Deputy General Counsel does nothing to indicate otherwise. Although the email mentions boxes of non-responsive materials, Gipson only responded that she was instructed to not turn "those things" over. What she meant could have been as narrow as non-responsive materials within the boxes, but more likely she was instructed to not turn over *anything* in the office, a clear violation of the subpoena.

105

One more point.  I wholeheartedly agree with the majority's determination that Jameson violated multiple provisions of the Code of Judicial Conduct, SCR 4.300, by impermissibly placing himself on both sides of ankle monitoring in that (i) he, as judge, required defendants to wear and pay for ankle monitors supplied by his non-profit corporation, and (ii) his non-profit corporation monitored and reported violations to him for which he then authorized warrants and then adjudicated.  However, another issue is presented.  In KRS Chapter 196, the legislature has deemed fit to include circuit judges in the mix for both the Kentucky State Corrections Commission, KRS 196.701(1)(g), and community corrections boards, KRS 196.725.  While it is nice to be wanted, to the extent those bodies can be said to exercise executive branch powers, judges should be extremely reluctant to participate in any more than a purely advisory role since doing so may implicate the prohibition of Kentucky Constitution Section 28: "[n]o person . . . being of one of those departments, shall exercise any power properly belonging to either of the others[.]"

Bisig, J., joins.

BISIG, J., CONCURRING IN PART AND DISSENTING IN PART: I concur with the Majority's conclusion that Judge Jameson's actions justify the imposition of our harshest sanction—removal.  I further agree with Chief Justice VanMeter's Opinion finding that the Judicial Conduct Commission met its burden with respect to two instances the majority found lacks sufficient support.  But I respectfully disagree with the Majority decision holding that the

106

Commission cannot permanently remove a judge from judicial office. I believe that the Commission may, in exercising its sound judgment, remove a judge from sitting within our judiciary entirely if that punishment is supported by clear and convincing evidence.

Section 121 of the Kentucky Constitution and SCR 4.020, both of which govern disciplining judges, contain no explicit limitation upon the removal of a judge from office. In this case, Judge Jameson was removed from office from November 4, 2022, the date the Commission issued its Final Order, until December 31, 2022, when his term expired. The Majority allows the removal here to effectively function as a two-month suspension, despite its recognition of Judge Jameson's deliberate course of action resulting in several instances of misconduct, the breadth of charges against him, and his unwillingness to understand how his actions undermine faith in the judiciary. I find no compelling reason for limiting the Commission's removal power to a certain period of time. Limiting the Commission's ability to remove judges poses great risks to the public and its confidence in our judiciary and compromises the Commission's role in maintaining an effective and ethical judiciary. Notably, as an additional safeguard, the Commission's final orders are subject to review, and this Court maintains the authority to affirm, modify, or set aside those orders pursuant to SCR 4.290.

COUNSEL FOR APPELLANT:

Bradley Alan Sears
Richard Lee Walter
Boehl Stopher & Graves, LLP

COUNSEL FOR APPELLEE:

Jeffrey Charles Mando
Joseph Kenton Hill
Adams Law, PLLC